UNITED STATES of America,
Plaintiff–Appellee,

v.

Kazys CIURINSKAS, Defendant–
Appellant.

No. 97–3067.

United States Court of Appeals,
Seventh Circuit.

Argued April 7, 1998.

Decided June 19, 1998.

John E. DeGuilio, Dyer, IN, Susan L. Siegal (argued), William H. Kenety, Washington, DC, for Plaintiff–Appellee.

Luke A. Casson (argued), Dyer, IN, for Defendant–Appellant.

Before EASTERBROOK, RIPPLE and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

Why would a person, who became a naturalized citizen of this country after World War II, apply for a war pension from the German government and at the same time expect us to believe that he did not lie on his various applications for entry into this country, applications which do not mention that he ever served in any military force, say nothing of one entitling him to a German war pension? But that is what Kazys Ciurinskas, a naturalized citizen originally from Lithuania, expects of us. He appeals from the decision of the district court, Judge James Moody, revoking his citizenship. *See United States v. Ciurinskas*, 976 F.Supp. 1167 (N.D.Ind.1997).

Before 1939 Lithuania existed as an independent country, bordered by Germany and the Union of Soviet Socialist Republics. It was an unfortunate location. In 1939 the Soviets came, placing 25,000 troops in Lithuania, and in 1940 they occupied the country, torturing and murdering officials, intellectuals, and civilians. The Soviets also took command of the Lithuanian army. In August 1940, Lithuania became a part of the Soviet Union. Then in June 1941, as part of its move on the eastern front, the German army under Adolf Hitler invaded Lithuania, encountering almost no resistance. Eighteen Nazi divisions advanced through Lithuania in approximately three days. At first, Lithuanians tended to view the German invasion as liberation from the Soviets and as a step toward the reestablishment of an autonomous Lithuania. Photographs exist of the first German military unit being greeted by enthusiastic crowds as it entered Kaunas, the wartime capital of Lithuania. During those days, to the extent Lithuanians were involved in fighting, they tended to fight the retreating Soviets rather than the Germans. Even as the hope for an autonomous Lithuania existed and radio announcements sought volunteers for the new Lithuanian army, the German occupation intensified. German mobile security police units known as Einsatzgruppen controlled the country along with a mobile unit of the German Order Police, the 11th Reserve Police Battalion, consisting of almost 500 officers and men.

Germany refused to recognized the Lithuanian provisional government, and the new Lithuanian army—the Battalion for the Defense of National Labor—was reorganized to serve German purposes; it came under the control of the Einsatzgruppe A and the 11th Police Reserve Battalion of the German Order Police. The name of the Lithuanian battalion was changed to, as translated from the Lithuanian language, Auxiliary Police Battalion; in German, it became the "Schutzmannschaft," which means, roughly, protective force. The order forming indigenous collaborators into auxiliary forces under the command of the German Order Police came from the notorious Heinrich Himmler on July 25, 1941. On July 31 these forces became the Schutzmannschaft.

The Schutzmannschaft soon had a role in the Final Solution—that is, Hitler's plan to "cleanse" the occupied Eastern territories by executing Jews, Soviet partisans, Gypsies, and "Bolsheviks," the latter a term used to refer to anyone else the Nazis considered undesirable. During the fall of 1941 and the following winter and into the spring, the Schutzmannschaft participated and assisted in the killing of thousands of civilians—primarily Lithuanian Jews and Jews in other occupied areas of the eastern front.

Ciurinskas does not dispute what happened; what he disputes, where it matters, is his role in the events. What is clear is that Ciurinskas served in the 2nd Lithuanian Schutzmannschaft, redesignated in February 1942 as the 12th. His route into the Schutzmannschaft was through his service in other military units. He was a member of the Lithuanian army prior to the Soviet invasion. After the invasion he was absorbed into the Soviet Army, where he remained until the German occupation. During the German occupation he remained in the army until he submitted a request for a discharge. He was apparently scheduled to be discharged sometime in April 1942, but that plan was dashed when he was wounded on April 1 while stepping on a land mine. He remained hospitalized for about a year and he did not return to active service. During the time he was in the Schutzmannschaft he was paid in German marks, wore a uniform, and was armed.

In the fall of 1941 Ciurinskas' unit of the Schutzmannschaft was stationed at Sanciai, in Kaunas. He spent time on guard duty at Fort IV, one of the twelve forts built during the 19th century to protect the city. On September 11 and 12, 1941, 140 members of his company were sent on a "special mission," a euphemism for an execution mission. Two members of the company have stated that at that time they took part in an operation near Jonava. On those days, 43 people were executed at Uzusalis, a village near Jonava. The names of those two members of the company appear with Ciurinskas' name on the list of persons sent on the special mission on those two days in September.

In October, most of the 2nd Schutzmannschaft Battalion was sent to an area near Minsk, Byelorussia (now Belarus). It was the only Lithuanian battalion in Byelorussia through the end of November 1941. From October 6 through December, the Schutzmannschaft, along with the German 11th Reserve Police Battalion, participated in a number of killing actions in Minsk and the surrounding areas. More than 19,000 civilians were executed. These included the 1,300 residents of a Jewish village of Smolevichi; over 630 persons who were killed on October 8 near Uzlany Rudensk; another

800 "partisans, Communists, Jews, and other suspicious riffraff" killed near Rudensk; 1,300 people killed in the sanitization of the community of Smilowicze; 625 civilian prisoners killed at a prison camp in Minsk; 1,150 Communists killed in another camp near Minsk; 1,000 Jews killed at Koydanov; the Jewish population of Slutsk—5,000 persons who were herded into ditches outside the city and executed; 6,600 Jews in the Minsk ghetto executed in order to make room for Jews arriving from Germany. Ciurinskas was promoted in December 1941 for conscientiously fulfilling his duties.

After he was released from the hospital, around April 1943, Ciurinskas worked at his cousin's mill on the outskirts of Kaunas for the balance of 1943 and 1944. He worked as a baggage handler at a railroad station in Breslau, Germany in 1944 and 1945.

In 1949 he sought to emigrate to the United States. He requested that the International Refugee Organization (IRO) certify him as eligible to apply for immigration into the United States under the Displaced Persons Act. During this process he signed an IRO resettlement registration form on which he stated that he had been employed between 1936 and 1944 as a miller at his own mill. He did not list any wartime service or any affiliation with any military or police units. If he had included on the application his Schutzmannschaft service, he would not have been certified as a displaced person "of concern" to the IRO. Such certification was necessary in order to be considered by the United States Displaced Persons Commission as a displaced person. In those days, the eligibility criteria for entry into the United States incorporated the IRO eligibility criteria.

Also as part of the application process, Ciurinskas was interviewed by the Counter Intelligence Corps (CIC) of the United States Army. The CIC report on Ciurinskas revealed nothing which would adversely affect his eligibility for immigration, even though a standard question during interviews regarded military service. Had he indicated that he was in the Schutzmannschaft he would have been admitting membership in an organization considered as "inimical," and

thus hostile, to the United States. Rather, the CIC concluded that Ciurinskas "ran his own mill at Kaunas, Lithuania 1936–1944." On July 7, 1949, Ciurinskas was certified as a displaced person.

On July 15, 1949, he applied for a visa. During the visa application process he was interviewed by a vice-consul to the American Consulate. Such interviews were conducted with the aid of an interpreter if necessary. Vice-consuls relied on the previous reports certifying the applicant as a displaced person. During the interview, Ciurinskas swore to the accuracy of the information on his IRO resettlement form—which included information that from birth until 1944 he resided in Lithuania and that during 1936 through 1944 he was a miller at his own mill in Kaunas. His visa was issued July 15, 1949. He entered the United States on October 24, 1949.

Ciurinskas applied to file a petition for naturalization on September 23, 1954. During this process, applicants were required to understand and answer in English the questions put to them. Ciurinskas swore under oath that the answers in his Form N–400, a naturalization form, were truthful. Answers on that form include that he had not belonged to any organizations in the prior ten years. On December 20, 1954, Ciurinskas filed another naturalization form—N–405—on which he stated under oath that he had lawfully entered the United States and that he was a person of good moral character. He became a naturalized citizen of the United States on February 17, 1955.

As is clear, Ciurinskas entered this country under the Displaced Persons Act, 62 Stat. 1009(DPA), enacted in 1948 to enable European refugees of the war to emigrate to this country without regard to traditional immigration quotas. The Act incorporated the definition of "refugees or displaced persons" from the constitution of the International Refugee Organization of the United Nations, which specifically excluded people who assisted the enemy in persecuting civilians or had voluntarily assisted enemy forces. *See* § 2(b), 62 Stat. 1009. Each applicant for displaced person status was first interviewed by representatives of the IRO, then by an official of the Displaced Persons Commission.

The final decision on eligibility under the DPA was made by one of several State Department vice-consuls. After all this, the application was reviewed by the Immigration and Naturalization Service to be sure the applicant met the standards set for admission into the United States under the immigration laws. *Fedorenko. v. United States*, 449 U.S. 490, 101 S.Ct. 737, 66 L.Ed.2d 686 (1981).

The naturalization process, of course, rests on the assumption that accurate and truthful information is presented by those seeking to become citizens of the United States. When naturalization is won by deceit, and material falsehoods are unmasked, the gift of naturalization can be revoked. And under 8 U.S.C. § 1451(a), a certificate of naturalization must be revoked if it was procured illegally, if it was procured by concealment of a material fact, or if it was procured by willful misrepresentation. If those conditions are found, the court has no discretion to refuse to revoke citizenship. The evidence against the naturalized citizen, however, must be clear, unequivocal, and convincing. *Fedorenko*, at 505, 101 S.Ct. 737. On appeal, we review a district court's findings in a denaturalization case under a clearly erroneous standard.

Ciurinskas' certificate of naturalization was revoked on seven independent grounds. Judge Moody found that Ciurinskas' citizenship was illegally procured under § 316(a)(1) of the Immigration and Naturalization Act (8 U.S.C. § 1427(a)(1)) and therefore must be revoked because he was not lawfully admitted to the United States for permanent residence; he was not eligible for the visa he obtained under the Displaced Persons Act (1) because he assisted the enemy in persecuting civilians; (2) because he voluntarily assisted enemy forces; (3) because he was a member of a movement hostile to the United States; and (4) because he willfully misrepresented material facts to obtain his visa. Further he was not eligible for a visa under State Department regulations (22 C.F.R. §§ 53.32–53.33) because he advocated or acquiesced in activities or conduct contrary to human decency and his entry was prejudicial to the interests of the United States. Next, the court found that he was not eligible for natu-

ralization because he was not a person of good moral character both because of his Schutzmannschaft service and because he gave false testimony to obtain admittance to the country. Finally, his citizenship was revoked because he concealed and willfully misrepresented material facts on his Form N–400 by failing to list the Schutzmannschaft as an organization to which he belonged and by denying that he ever gave false testimony to obtain benefits under the immigration and naturalization laws. Any one of these grounds, standing alone, is a sufficient basis for revocation of his citizenship.

Ciurinskas' appeal is grounded on a few themes, some of which are applicable to more than one of the grounds on which his citizenship was revoked. He argues that there is no evidence that he personally participated in atrocities nor that he was a voluntary participant; he contends that he thought the unit he was a part of was dedicated to the independence of Lithuania and that he did not "join the Schutzmannschaft" as that unit was described in the evidence; that he was not specifically asked whether he was in the military when he was applying for entry and for naturalization; and that, besides all this, he might have misunderstood the questions because he was not sufficiently fluent in English. He also argues that he should be entitled to a jury trial.

In large part, his claims depend on his own testimony and therefore on his credibility. Credibility is, of course, a matter for the trier of fact, in this case the district judge. There can be no doubt about Judge Moody's evaluation of Ciurinskas' credibility; it was, in the judge's word, "poor." For one thing, Ciurinskas was said to display a "remarkable ability to remember with clarity events that occurred more than fifty years ago when those events benefit him but claimed convenient lapses of memory regarding details one would expect him to remember." Furthermore, the judge noted his "motive to lie and the sheer preposterousness of much of his testimony." We accept Judge Moody's credibility determinations.

▉ A look at Ciurinskas' credibility leads us straight to one of his contentions: that is, that he did not personally participate in atrocities and that the trial court was wrong to find that he did. As we have said, Ciurinskas does not dispute that the 2nd Battalion participated in the events we just described. However, he contends, for instance, that he was never in Minsk; therefore he could not have been involved in the killings in Byelorussia. And, he contends, even if he was in Minsk, no one has specifically identified him as a person who committed atrocities.

There is, however, significant evidence that contradicts his claim. His name appears on the order deploying some 490 members of the 2nd Schutzmannschaft to Minsk and does not appear in that portion of the order listing the 41 members who were to remain in Kaunas. An order issued in Minsk on December 17, 1941, lists Kazys Ciurinskas as a person promoted to Private First Class. In his application for a war pension in 1966 he said he had been a member of the Schutzmannschaft Battalion 12 from June 24, 1941, to January 1, 1944. As we have said, the 2nd and the 12th are the same battalion, and it was designated as the 12th Battalion only after it was sent to Minsk. In a letter supporting his application he said he was severely wounded by a land mine explosion while on an official assignment during the return from Minsk. He also submitted a travel pass dated December 22, 1941, authorizing him to travel from Minsk to Kaunas. Finally, as clearly bearing on his credibility, as Judge Moody said, Ciurinskas slipped up during his testimony at trial: he referred to being stationed in Minsk.

Other members of Ciurinskas' unit have confirmed that the company assisted in the killing actions. One former member indicated that all men not assigned specifically to other duties would participate in killing actions. At Slutsk, where 5,000 people were executed in two days, the entire company, except a few left behind to guard the barracks and work in the kitchen, participated. By order dated November 6, 1941, in Minsk, Ciurinskas was assigned to guard duty with the German 11th Reserve Police Battalion. Between November 7 and 11, 6,600 Jews living in the Minsk ghettos were slaughtered. To interpret these events, the government

called Dr. Richard Breitman, chairman of the history department at American University and author of an important study concerning the use of the Schutzmannschaft by the Nazis. Dr. Breitman, an impressive Holocaust scholar, testified that during the early stages of the war the Germans consistently used the non-German local forces for "mass executions and anti-partisan sweeps." His conclusion was that the evidence unequivocally established that Ciurinskas participated in the actions at Minsk.

Even if Ciurinskas had not personally participated, his service in the 2nd Battalion is sufficient to constitute assistance in persecution, as set out in § 2(b) of the DPA and the IRO Constitution. *Fedorenko*; *United States v. Kairys*, 782 F.2d 1374 (7th Cir. 1986). We see little difference between being a concentration camp guard as Fedorenko was and being a member of a force dedicated to the extermination of large numbers of civilians as was Ciurinskas. His membership in the Schutzmannschaft is also sufficient to show that he participated in a movement hostile to the United States, as defined in § 13 of the DPA, and to show that he participated in conduct contrary to civilization and human decency, pursuant to State Department Regulations, 22 C.F.R. § 53.33(j) (1949), App. 3099.

■ Ciurinskas' next contention is that his membership in Schutzmannschaft was not voluntary; therefore, he could not have voluntarily assisted the enemy nor could he have voluntarily participated in a movement hostile to the Unites States. We will first point out that voluntariness is a requirement only under § 2(b) of the DPA as interpreted by *Fedorenko* for exclusion on the basis that one gave voluntary assistance to enemy forces. In any case, it was not clearly erroneous for the district court to find that Ciurinskas' participation in the Schutzmannschaft was voluntary.

Ciurinskas' argument is that he never joined any unit. He was conscripted into the Lithuanian army in 1939. When the Soviets came he was not released, nor was he when the Germans invaded. He argues that even if he joined the Lithuanian Battalion for the Defense of National Labor, he believed, as did most Lithuanians, that he was part of an effort seeking independence for Lithuania.

There is some evidence that those joining the Schutzmannschaft took oaths, but the court found that the government had failed to establish that Ciurinskas did. Thus, when he joined the Schutzmannschaft he may not have known that he would be serving a military organization controlled by the Germans, but the court found that he knew within a short period of time. Members of the Schutzmannschaft wore uniforms and were armed. Ciurinskas was paid in German marks; he was commanded by German officers; the members wore armbands bearing the inscription "Schutzmann." In addition, the court noted that while his application for a pension from the German government in 1966 does not prove what he knew in 1941, it does suggest that he knew he was serving the Germans. Furthermore, there was no evidence of conscription by the Germans. Documents exist which state, for example, that Lithuanians who would like to serve in the auxiliary forces were being accepted; however, documents also imply that not all who applied were, in fact, accepted. The Schutzmannschaft members were allowed to take leave and were permanently released from service upon a written request. Ciurinskas, in fact, availed himself of this option and was set to be released when he was injured by stepping on the land mine. Upon our review of the record, we cannot conclude that the court's finding that Ciurinskas provided voluntary assistance to enemy forces was clearly erroneous.

■ The trial court also found that Ciurinskas was ineligible for a visa under Section 10 of the DPA because he willfully misrepresented and concealed his Schutzmannschaft service from the IRO, CIC, and the vice-consul during the time he was seeking entry into the United States. He does not deny that he gave the answers he gave. But he claims, on the one hand, that he was not specifically asked whether he was in the military and, on the other, that he did not have an adequate grasp of the English language at the time he answered the questions. These arguments fall far short of persuading us that the findings of

the judge are clearly erroneous. Ciurinskas made an affirmative misrepresentation on more than one occasion of what his activities were in the years in question. By saying that he was a miller at his own mill during the war years, he answered the questions about his occupation in a manner which would help his immigration attempt. On all these points, the findings of the district judge must be upheld. It is also clear that the finding that he lacked the good moral character required for citizenship, pursuant to 8 U.S.C. § 1427(a)(3), is also not clearly erroneous.

■ Finally, Ciurinskas argues that he should be granted a jury trial despite the fact that for over 85 years, it has been established that a denaturalization action is a suit in equity. *Luria v. United States*, 231 U.S. 9, 34 S.Ct. 10, 58 L.Ed. 101 (1913); *Schneiderman v. United States*, 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796 (1943). Ciurinskas argues that the matter is "ripe for reconsideration by the Circuit and the Supreme Court." Knowing our place in the grand scheme of things, we decline to change the law on this point.

The decision of the district court is AFFIRMED.