In the
United States Court of Appeals
For the Seventh Circuit

No. 00-1518

Juozas Naujalis,

Petitioner,

v.

Immigration and Naturalization Service and
John Ashcroft, Attorney General of the United
States,

Respondents.

Petition for Review from the
Board of Immigration Appeals of the
Immigration and Naturalization Service
No. A 7 258 120

Argued September 28, 2000--Decided February 15, 2001

Before Posner, Manion, and Diane P. Wood, Circuit
Judges.

Manion, Circuit Judge.  In May 1949, Juozas
Naujalis, a Lithuanian native, applied for and
received an immigrant visa to enter the United
States under the Displaced Persons Act; but in
doing so he failed to disclose his service in a
Lithuanian battalion that assisted the Nazis in
their persecution of civilians during World War
II. In October 1995, the United States filed an
Order to Show Cause with the Immigration Court,
charging that Naujalis was deportable because of
his service in the Lithuanian battalion. After a
merits hearing in 1997, the Immigration Court
ordered Naujalis deported to Lithuania. The Board
of Immigration Appeals affirmed the deportation
order, and Naujalis appeals. We affirm.

I.

On June 22, 1941, the armed forces of Nazi
Germany invaded the Soviet Union, sweeping
through the Soviet-dominated Baltic States and
occupying Lithuania within a week. Special Nazi
Security Police forces followed the German Army
into Lithuania primarily to execute Jews,
communists, and others regarded as enemies of the
Third Reich.

Many Lithuanians initially viewed the German Army as liberators from Soviet domination, and they attempted to establish an independent Lithuanian government and form a national army. But the Germans quickly converted the provisional national government into an indigenous administrative apparatus, and subordinated the Lithuanian Army into auxiliary police forces to supplement the Nazi Security Police units. In early August 1941, the German 11th Police Reserve Battalion (German 11th Battalion) arrived in Lithuania and assumed control of all indigenous Lithuanian units, including the auxiliary police force that became known as the 2nd Auxiliary Police Battalion (2nd Battalion)./1 The members of the 2nd Battalion were volunteers and were paid in German marks.

Juozas Naujalis served in the Lithuanian Army from 1938 to July 1940, when he returned to his father's farm in Lithuania. After the Germans forced the Soviets out of Lithuania, Naujalis voluntarily joined the 2nd Battalion in August of 1941 to serve the new Lithuanian Army. He was transferred as a "gunner" to the First Company of the 2nd Battalion with the rank of Lance Corporal and the rights of a squad leader. The Nazis took control of the 2nd Battalion shortly after Naujalis joined.

On October 6, 1941, the Nazis transferred the 2nd Battalion, along with the German 11th Battalion, from Lithuania to Minsk in Byelorussia (now Belarus). Their mission was to exterminate "Bolshevism" by eliminating the remnants of the Bolshevik army and its partisans from the Minsk-Borisov-Slutsk region. According to the Nazis, "Bolshevism" and "Bolsheviks" referred to Jews and members of the Communist Party. Naujalis was transferred to Minsk with the 2nd Battalion.

During October 1941, the 2nd Battalion assisted the German 11th Battalion in a series of killing missions in which they executed over 11,000 men, women and children. The soldiers of the 2nd Battalion participated in these missions by surrounding villages, locating victims in their homes and workplaces, marching them to killing fields, forcing them to undress and lie in pits, and then shooting the victims. The Battalions' "cleansing" actions in Byelorussia included the execution of at least 617 civilians in Dukara on October 8, 1941; 800 communists, Jews, and other "partisans" in the Rudensk area from October 9-11; 1,300 communists, Jews, and other "hostile" persons in Smilovichi on October 14; 625 communists from a civilian prison camp in Minsk on October 15; an additional 1,150 communists from the Minsk camp on October 18; 1,000 Jews and

communists in Kojdanov on October 21; and 5,900
Jews in Slutsk on October 27-28, 1941.

   In Naujalis's sworn statement taken in 1992, he
claimed that he did not personally participate in
any of the 2nd Battalion's killing missions
because he spent the month of October 1941 (and
that entire winter) in Minsk guarding a railway
station against possible Soviet attack.

   From November 1-14, 1941, Naujalis was assigned
with other 2nd Battalion members to the village
of Kojdanov. In November of 1943, two years after
the atrocities, Naujalis deserted the 2nd
Battalion while on furlough. He was caught and
arrested for desertion, and spent a year in jail.
He later fled to Germany where he worked as a
forced laborer.

   In May 1949, Naujalis applied to the United
States Displaced Persons Commission (DPC) to
establish his status as a Displaced Person so
that he could emigrate to the United States under
the Displaced Person Act (DPA)./2 Naujalis never
informed the DPC of his service in the 2nd
Battalion, and the DPC certified him as a
Displaced Person on May 16, 1949. He then applied
for and received an immigrant visa, and entered
the United States under the DPA in August 1949.
Naujalis never applied for U.S. citizenship.

   In October 1995, the United States filed an
Order to Show Cause (Order) with the Immigration
Court, charging that Naujalis was deportable,
pursuant to 8 U.S.C. sec. 1227(a)(4)(D)(the
Holtzman Amendment),/3 for assisting Nazi-
directed persecution through his membership and
service in the 2nd Battalion. The Order also
charged that Naujalis was deportable under 8
U.S.C. sec. 1227(a)(1)(A)/4 for being
inadmissible when he entered the United States
because his service in the 2nd Battalion
constituted voluntary assistance to the enemy
(rendering him ineligible for a visa under
Section 2 of the DPA), and membership or
participation in a movement hostile to the United
States (rendering him ineligible for a visa under
Section 13 of the DPA)./5 The Immigration Court
held a merits hearing in April 1997, found that
Naujalis was deportable under 8 U.S.C. sec.sec.
1227(a)(4)(D) and 1227(a)(1)(A), and ordered him
deported to Lithuania.

   Naujalis appealed to the Board of Immigration
Appeals (Board), arguing that he was not
deportable under the Holtzman Amendment because
he spent the month of October 1941 (and that
entire winter) guarding a Minsk railway station,
and thus never personally participated in any of
the 2nd Battalion's atrocities. He also contended

that he was not deportable under 8 U.S.C. sec. 1227(a)(1)(A) for providing voluntary assistance to the enemy (pursuant to Section 2 of the DPA) because his service in the 2nd Battalion was no longer voluntary when the Germans transported the 2nd Battalion at gunpoint from Lithuania to Minsk. Naujalis also challenged the Immigration Court's conclusion that he was ineligible for a visa under Section 13 of the DPA because, according to Naujalis, the 2nd Battalion was formed as a Lithuanian police force and not as a movement hostile to the United States.

The Board dismissed Naujalis's appeal, concluding that he was deportable under the Holtzman Amendment pursuant to United States v. Ciurinskas, 148 F.3d 729 (7th Cir. 1998), in which this court held that Ciurinskas's membership and service in the same 2nd Lithuanian Battalion (without proof that he personally participated in atrocities) was sufficient to establish his assistance in persecution under Section 2(b) of the DPA./6 Id. at 734. The Board also noted that a finding of assistance in persecution is legally identical under the DPA and the Holtzman Amendment./7 See Schellong v. INS, 805 F.2d 655, 660-61 (7th Cir. 1986). And the Board concurred with the Immigration Court's conclusion that Naujalis was deportable under 8 U.S.C. sec. 1227(a)(1)(A) because his membership and service in the 2nd Battalion constituted voluntary assistance to the enemy (according to Section 2 of the DPA), and membership in a movement hostile to the United States (according to Section 13 of the DPA). Naujalis, who is now 81 years old, appeals to this court.
II.

Naujalis does not dispute that the 2nd Battalion committed the atrocities listed above. His first argument on appeal is that the United States never presented clear, unequivocal and convincing evidence that he personally participated in any of the 2nd Battalion's killing missions, and thus the Board erroneously found him deportable under the Holtzman Amendment.

The government has the burden of proof in deportation proceedings, and must establish the facts supporting deportability with clear, convincing and unequivocal evidence that does not leave the issue in doubt. Fedorenko v. United States, 449 U.S. 490, 505 (1981). We review the Board's legal conclusions de novo, Sayaxing v. I.N.S., 179 F.3d 515, 519 (7th Cir. 1999), but we defer to the Board's factual findings, reversing them only if they lack the support of substantial evidence in the record. Malek v. I.N.S., 198 F.3d 1016, 1021 (7th Cir. 2000). Therefore, the Board's determination that a petitioner is

deportable is conclusive unless evidence in the record would compel a reasonable adjudicator to conclude to the contrary. 8 U.S.C. sec. 1252(b)(4)(B); I.N.S. v. Elias-Zacarias, 502 U.S. 478, 481 (1992).

Congress enacted the Holtzman Amendment in 1978 to ensure "that the United States is not a haven for individuals who assisted the Nazis in the brutal persecution and murder of millions of people." Schellong, 805 F.2d at 662. The Amendment provides for the deportation of aliens who "ordered, incited, assisted, or otherwise participated" in Nazi-directed persecution of individuals because of their race, religion, national origin, or political opinion. United States v. Tittjung, 235 F.3d 330, 334 n.2 (7th Cir. 2000); 8 U.S.C. sec.sec. 1182(a)(3)(E) and 1227(a)(4)(D).

In this case, the government must demonstrate that Naujalis's conduct assisted the 2nd Battalion to commit atrocities. See Fedorenko, 449 U.S. at 512 n. 34. To prove that Naujalis assisted in Nazi-directed persecution, the government does not have to establish that Naujalis's assistance in persecution was voluntary, id. at 512, or that he personally participated in the atrocities. See id. (a perimeter guard at the Treblinka death camp assisted in persecution even though there was insufficient evidence that the guard personally committed atrocities); see also Ciurinskas, 148 F.3d at 734 (Ciurinskas's membership and service in the 2nd Battalion (without proof of his personal involvement in atrocities) was sufficient to constitute assistance in persecution); accord Kulle v. I.N.S., 825 F.2d 1188, 1192 (7th Cir. 1987). According to the Holtzman Amendment's non-criminal provision, we may infer one's assistance in persecution "from the general nature of the person's role in the war" and thus "atrocities committed by a unit may be attributed to the individual based on his membership and seeming participation." Kalejs v. I.N.S., 10 F.3d 441, 444 (7th Cir. 1993).

In support of the Board's conclusion that Naujalis's membership and service in the 2nd Battalion constituted assistance in persecution under the Holtzman Amendment, the Board cited the Fedorenko case for the principle that an individual's military service may qualify as assistance in persecution under the DPA without proof of the individual's personal involvement in atrocities. The Board then discussed the Ciurinskas case in which the defendant served in the same 2nd Lithuanian Battalion as Naujalis. According to the Board, this court in Ciurinskas concluded that "even if Ciurinskas had not

personally participated in the killing actions in Byelorussia, his service in the persecutory unit, like that of a concentration camp guard, was sufficient to constitute assistance in persecution under the DPA." The Board also quoted Ciurinskas where this court stated that "We see little difference between being a concentration camp guard as Fedorenko was and being a member of a force dedicated to the extermination of large numbers of civilians as was Ciurinskas." Ciurinskas, 148 F.3d. at 734. The Board then concluded that "in light of the court's holding in [Ciurinskas], by which we are bound, we find that [Naujalis's] undisputed service in the [2nd Battalion], in and of itself, establishes his deportability under [8 U.S.C. sec. 1227(a)(4)(D)]."

Naujalis contends that his case is different from the Ciurinskas case because unlike Ciurinskas (who falsely claimed that he was never stationed with the 2nd Battalion in Minsk), Naujalis admitted that he was in Minsk and distinguished his duties from the majority of 2nd Battalion members who participated in killing missions. In support of his contention, Naujalis claims that it is "inconceivable" that the Germans would have abandoned the "vital" railway station in Minsk while the 2nd Battalion and the German 11th Battalion were deployed on killing missions, and thus the Germans entrusted experienced soldiers like himself (not mere privates) to guard the station to ensure that munitions, tanks and artillery arrived at the Eastern Front. To further corroborate his claim, Naujalis identifies statements in the record made by other former 2nd Battalion members who affirmed that all of the soldiers participated in the killing operations unless they were guarding other facilities.

We conclude that Naujalis's own admissions and assertions that he guarded a vital railway facility in Minsk as a soldier in the 2nd Battalion during October 1941 sufficiently establish that he assisted Nazi-directed persecution. The Nazis controlled the 2nd Battalion, and its primary mission in October of 1941 was to murder civilian populations in and around Minsk. The 2nd Battalion and the German 11th Battalion executed over 11,000 men, women, and children in 21 days. According to Naujalis, he was an experienced soldier who supported the 2nd Battalion with armed, uniformed, military service as a guard of a railway station that was vital to the Nazi war effort. Thus he provided active, armed, military service on a significant assignment, and did not merely accommodate the Nazis in some passive, minimal way by performing non-military tasks. Moreover, Naujalis's service

contributed to the overall strength and dynamic of the 2nd Battalion. The Nazis could rely on Naujalis to guard a vital facility so that other 2nd Battalion (and German 11th Battalion) soldiers could be deployed on large-scale killing missions. Arguably, the 2nd Battalion would not have been able to murder so many civilians as efficiently and effectively without Naujalis's contribution. We conclude, therefore, that substantial evidence supports the Board's finding that Naujalis assisted the Nazis in persecuting civilians, and thus he is deportable under the Holtzman Amendment./8 See Ciurinskas, 148 F.3d at 734. Accordingly, we AFFIRM the Board's decision.

/1 The Germans designated the 2nd Battalion as the "2nd Lithuanian Schutzmannschaft Battalion" in October of 1941.

/2 Congress enacted the DPA in 1948 "to enable European refugees driven from their homelands by the war to emigrate to the United States without regard to traditional immigration quotas." Fedorenko v. United States, 449 U.S. 490, 495 (1981).

/3 This is the current provision. The Order actually charged that Naujalis was deportable under Section 241(a)(4)(D) of the Immigration and Nationality Act of 1952 (INA), 8 U.S.C. sec. 1251(a)(4)(D). These provisions are now codified as INA Section 237(a)(4)(D), 8 U.S.C. sec. 1227(a)(4)(D). For simplicity, we will refer only to the current provision: 8 U.S.C. sec. 1227(a)(4)(D).

/4 This is the current provision. The Order actually charged that Naujalis was also deportable under INA Section 241(a)(1)(A), 8 U.S.C. sec. 1251(a)(1)(A). These provisions are now codified as INA Section 237(a)(1)(A), 8 U.S.C. sec. 1227(a)(1)(A). For simplicity, we will refer only to the current provision: 8 U.S.C. sec. 1227(a)(1)(A).

/5 We note that although Naujalis never informed the DPC of his service in the 2nd Battalion, the United States chose not to charge him as ineligible for a visa pursuant to Section 10 of the DPA (and thus deportable under 8 U.S.C. sec. 1227(a)(1)(A)) for willfully making a misrepresentation to gain entry into the United States. See United States v. Ciurinskas, 148 F.3d 729, 734 (7th Cir. 1998).

/6 Section 2 of the DPA excluded individuals from "displaced person" status if they assisted the enemy in persecuting civilians, or voluntarily

assisted enemy forces. See Fedorenko, 449 U.S. at 509-12; see also Ciurinskas, 148 F.3d at 732.

/7 Furthermore, the Board found implausible Naujalis's claim that he was exclusively assigned to guard a railway station in Minsk and never personally participated in any of the 2nd Battalion's atrocities. According to the Board, Naujalis's account of his 2nd Battalion duties is not credible because his 1992 statement contains significant discrepancies about his assignments in Minsk: Naujalis first claimed that he spent the month of October in Minsk doing "absolutely nothing" in an old school building, but later asserted that he guarded a railway station during the entire winter season. The Board also noted that there was no evidence in the record to corroborate Naujalis's claim that some 2nd Battalion members were assigned exclusively to guard duty at railway stations or other such installations during the period of the Battalion's killing actions in Byelorussia. The Board further reasoned that it was "inherently improbable" that Naujalis never participated in any killing missions while, according to the government's expert historian, Dr. Conrad Kwiet, Naujalis commanded ten to fifteen men as a squad leader with the rank of Lance Corporal in the First Company, which the Nazis used more than the Battalion's other two companies for "particularly important duties" to accomplish the mission of exterminating perceived racial and political enemies of the Nazi regime.

/8  Naujalis also raises several claims on appeal that he never received a "full and fair" hearing, but because his own admissions and assertions sufficiently establish that he assisted persecution and is deportable, we decline to address this issue. And because we conclude that Naujalis is deportable under the Holtzman Amendment, we reserve opinion on the Board's additional findings that he is deportable under 8 U.S.C. sec. 1227(a)(1)(A).