305 F.Supp.2d 1101 (2004)
UNITED STATES of America, Plaintiff,
v.
Adam FRIEDRICH, Defendant.
No. 4:02-CV-1075(CEJ).
United States District Court, E.D. Missouri, Eastern Division.
February 24, 2004.
*1102 David W. Folts, U.S. Department of Justice, Special Investigations, Criminal Div., Eli Rosenbaum, U.S. Department of Justice, Special Investigations, Criminal Div., Elizabeth B. White, U.S. Department of Justice, Special Investigations, Criminal Div., Washington, DC, Maria C. Sanchez, Office of U.S. Attorney, St. Louis, Susan L. Siegal, U.S. Department of Justice, Special Investigations, Criminal Div., William H. Kenety, V, U.S. Department of Justice, Special Investigations, Criminal Div., Washington, DC, for USA, Plaintiff.
D. Warren Hoff, Jr., St. Louis, MO, for Adams Friedrich, Defendant.

MEMORANDUM AND ORDER
JACKSON, District Judge.
This matter is before the Court on plaintiff's motion for summary judgment. Defendant opposes the motion and the issues are fully briefed.
The United States brings this action to revoke the citizenship of defendant Adam Friedrich under Section 340(a) of the Immigration and Nationality Act of 1952, (INA) 8 U.S.C. § 1451(a). Friedrich entered the United States in 1955 pursuant to a visa obtained under the Refugee Relief Act of 1953(RRA), Pub.L. No. 203, 67 Stat. 400, as amended, 68 Stat. 1044 (1954), and obtained naturalization thereafter. It subsequently became known that Friedrich had been a member of the Waffen SS during World War II and that he had served as a guard at three German concentration camps. The government contends that Friedrich's service in the Waffen SS made him ineligible for a visa under the RRA and therefore ineligible for naturalization.

I. Legal Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In ruling on a motion for summary judgment the court is required to view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts. AgriStor Leasing v. Farrow, 826 F.2d 732, 734 (8th Cir.1987). The moving party bears the burden of showing both the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); Fed.R.Civ.P. 56(c). Once the moving party has met its burden, the non-moving party may not rest on the allegations of his pleadings but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. Fed.R.Civ.P. 56(e). Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corporation v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

II. Background[1]
Defendant Adam Friedrich was born in 1921 in Hatzfeld, Romania, to ethnic German *1103 parents. To avoid entering the Romanian army, Friedrich illegally crossed the border into Yugoslavia in 1941. He remained there for about two months before being employed by the East German Agricultural Company as a laborer. He became dissatisfied with the working conditions and sought different employment but was told he was subject to a work contract from which he could be released only for military service. Friedrich was turned away from the Wehrmacht, the German Armed Forces, because he was not a German citizen. He joined the Waffen SS instead and began active duty on October 1, 1942.
In January 1943, after completing basic training, Friedrich was transferred to the Gross-Rosen concentration camp where he was assigned to the Totenkopf, or Death's Head, unit. The Death's Head unit operated and guarded concentration camps. United States v. Negele, 222 F.3d 443, 445 (8th Cir.2000). Among the 100,000 prisoners at Gross-Rosen in Janaury 1943 were civilian Jews, Poles, Russians, Ukrainians, Gypsies and Jehovah's Witnesses. The prisoners received inadequate nutrition, clothing, and medical care and were used as slave labor in the nearby stone quarry. Nearly 1,500 prisoners died at Gross-Rosen during the first five months of 1943.
The Death's Head unit guards at Gross-Rosen rotated among several duties, including guarding the camp perimeters at night, escorting work-details to the quarry, and guarding the prisoners while at the quarry. The guards were instructed to shoot prisoners who attempted escape. Friedrich's duties were to prevent prisoners from escaping from the camp and to guard them while they worked outside the camp. Friedrich denies ever witnessing an escape. Although he always carried a loaded rifle while on duty, Friedrich denies that he ever fired his weapon.
In August 1943, Friedrich was one of about 60 guards that escorted a group of approximately 200 prisoners from Gross-Rosen to the Dyhenfurth camp. Friedrich remained at Dyhenfurth until January 1945. During that period he married and his first child was born. His duties at Dyhenfurth were much the same as they had been at Gross-Rosen.
When the Soviet Red Army advanced on Dyhenfurth in January 1945 the camp was evacuated. Friedrich was one of 100 to 150 guards who marched a group of about 1,000 prisoners back to Gross-Rosen. Friedrich testified that the march took several days during which prisoners and guards slept in open fields at night. Friedrich testified that the prisoners may not have received any food and that they had no blankets. Evidence in the record indicates that several prisoners died during the evacuation from Dyhenfurth. Friedrich denies that he observed any deaths.
Gross-Rosen was evacuated in early February 1945. Friedrich was among the detail that escorted approximately 1,000 prisoners to the Flossenburg concentration camp. He testified that the prisoners marched for about a day to a functioning railroad where they were then were loaded onto cattle cars. The rail journey took about a day and a half, during which prisoners were provided no food or sanitation facilities. Flossenburg received thousands of prisoners as other camps were evacuated. *1104 Large numbers of prisoners died as a result of inadequate food, medical treatment, and brutality.
In April 1945, Flossenburg was evacuated as Allied forces advanced. Friedrich accompanied prisoners on an evacuation march toward the Dachau concentration camp. The group was overtaken on the road by American soldiers. Friedrich testified that he and the other guards abandoned the prisoners and scattered into the woods. He discarded his rifle and dog tags immediately and, when he found other clothes to wear, he discarded his uniform.
Friedrich reunited with his wife and family in Austria, and they remained there for ten years. In 1953, he applied for a visa to the United States through the National Council of Churches. His visa application stated that he was in the Romanian army from 1941 to 1942, and the German Army from 1942 to 1945. The application made no mention of his service with the Waffen SS or his duty at the concentration camps. Friedrich traveled to the United States Embassy in Salzburg, where he was interviewed by several people from different agencies. Friedrich testified that he was not asked whether he had served in the SS and he did not volunteer that information. On February 10, 1955, U.S. State Department Vice Consul David Jelinek issued Friedrich a visa. Jelinek testified at deposition that he would not have issued Friedrich the visa if he had known that Friedrich had served as a concentration camp guard. Friedrich was naturalized on May 4, 1962, by the United States District Court for the Eastern District of Missouri and received Naturalization Certificate No. 8497460.
In opposing summary judgment, Friedrich does not dispute the government's evidence regarding the conditions at the three camps where he was a guard. Rather, Friedrich disputes what he terms the government's "implication" that he personally whipped, beat, tortured, abused, and shot any prisoners. The record contains no testimony linking Friedrich to specific acts of brutality and the government does not make any contention that he engaged in such acts.

III. Discussion

The issue before the Court at this stage is whether Friedrich's acknowledged service as an armed concentration camp guard while a member of the Death's Head unit rendered him ineligible for the visa he received under the RRA. Friedrich argues that the government cannot prevail in the absence of evidence that he personally engaged in acts of persecution.
The right to acquire American citizenship is precious, and once acquired, its loss can have severe consequences. Fedorenko v. United States, 449 U.S. 490, 505, 101 S.Ct. 737, 66 L.Ed.2d 686 (1981); Costello v. United States, 365 U.S. 265, 269, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961). The government's burden of proof in a proceeding to divest a naturalized citizen of his citizenship is accordingly a heavy one. Fedorenko, 449 U.S. at 505, 101 S.Ct. 737; Costello, 365 U.S. at 269, 81 S.Ct. 534. The evidence justifying revocation of citizenship must be "clear, unequivocal, and convincing," and may not "leave the issue in doubt." Fedorenko, 449 U.S. at 505, 101 S.Ct. 737 (internal quotations and citations omitted). At the same time, Congress alone has the constitutional authority to prescribe rules for naturalization, and courts must insist on strict compliance with all congressionally imposed prerequisites to the acquisition of citizenship. Id. at 506, 101 S.Ct. 737.
Title 8 U.S.C. § 1451(a), provides in pertinent part as follows:

*1105 It shall be the duty of the United States attorneys ... to institute proceedings ... in the judicial district in which the naturalized citizen may reside at the time of bringing suit, for the purpose of revoking and setting aside the order admitting such person to citizenship and canceling the certificate of naturalization on the ground that such order and certificate of naturalization were illegally procured or were procured by concealment of a material fact or by willful misrepresentation ....
The government asserts that Friedrich's naturalization was "illegally procured."[2] Among the requirements for naturalization is "lawful admission" for permanent residence. 8 U.S.C. § 1427. Friedrich gained admission to the United States pursuant to the Refugee Relief Act of 1953(RRA), Pub.L. No. 203, 67 Stat. 400, as amended 68 Stat. 1044 (1954). Section 14(a) of the RRA provided that no visa would be issued to persons "who personally advocated or assisted in the persecution of any person ... because of race, religion, or national origin." The government contends that Friedrich's service in the Waffen SS rendered him ineligible for a visa under the RRA. If the government is correct and Friedrich's RRA visa was invalid, then he was not lawfully admitted for permanent residence. 8 U.S.C. § 1181(a)(1) (no immigrant shall be admitted into the United States without a valid unexpired immigrant visa). Absent lawful admission to the United States, Friedrich's citizenship was illegally procured. 8 U.S.C. § 1427(a)(1) (naturalization requirements), § 1451(a). United States v. Dailide, 227 F.3d 385, 390 (6th Cir.2000); United States v. Negele, 222 F.3d 443, 447 (8th Cir.2000).
Much of the case law supporting the government's position involves persons who obtained naturalization after entering the United States on visas issued pursuant to the Displaced Persons Act (DPA), 62 Stat. 1009 (1948). See, e.g., Fedorenko, supra (petitioner who concealed service as concentration camp guard ineligible for visa under DPA and thus citizenship was illegally procured); United States v. Szehinskyj, 277 F.3d 331 (3d Cir.2002) (same); Dailide, supra (same); Negele, supra (same); United States v. Breyer, 41 F.3d 884 (3d Cir.1994); United States v. Schmidt, 923 F.2d 1253 (7th Cir.1991); United States v. Tittjung, 753 F.Supp. 251 (E.D.Wis.1990), aff'd, 948 F.2d 1292 (7th Cir.1991). The DPA enabled European refugees driven from their homelands by World War II to emigrate to the United States without regard to the usual immigration quotas. Fedorenko, 449 U.S. at 495, 101 S.Ct. 737. The Act excluded from relief individuals who had "assisted the enemy in persecuting civil[ians]" or who had "voluntarily assisted the enemy forces ... in their operations." Id. at 496 nn. 3, 4, 101 S.Ct. 737 (quoting the DPA and Annex I to the Constitution of the International Refugee Organization of the United Nations, ratified by the United States on December 16, 1946, 62 Stat. 3051-52).
Friedrich argues that differences between the language of the DPA and the RRA dictate that the government cannot rely on the fact of his Waffen SS service as a concentration camp guard alone. The RRA excludes from eligibility those persons "who personally advocated or assisted in the persecution of any person or group of persons because of race, religion, *1106 or national origin." Pub.L. No. 203, 67 Stat. 400, as amended, 68 Stat. 1044 (1954) (emphasis added). Friedrich argues that the modifier "personally" places upon the government the "higher" burden to establish that he subjectively intended to engage in persecution by proving that he committed individual acts of persecution "such as whipping, beating, etc.". The government counters that both the plain language and legislative history indicate that Congress included the word "personally" in the RRA to ensure that individuals were excluded from the United States based upon their own conduct, rather than mere membership in an organization. Furthermore, the government contends, service as a concentration camp guard is sufficient to qualify as persecution without proof of individual acts of a more extreme nature.
"Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." Neosho R-V School Dist. v. Clark, 315 F.3d 1022, 1032 (8th Cir.2003) (quoting United States v. Albertini, 472 U.S. 675, 680, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985)). Where, as here, the statute does not define a word, the Court looks to the ordinary, common sense meaning. United States v. Vig, 167 F.3d 443, 447 (8th Cir.1999). "Personal," as defined by Black's Law Dictionary, (5th Ed.1979), means "Appertaining to the person; belonging to an individual ..." The Random House College Dictionary, Rev. Ed. (1980) defines "personally" as "as regards oneself, [ ] as an individual..." In the context of the RRA, "personally" targets the advocacy or assistance in persecution committed by the individual rather than the group of which the individual is a member. Nothing in the definition of "personal" supports Friedrich's construction of the RRA as requiring proof of his subjective intent to persecute others. Nor does the word "personally" equate with "more egregious," or "more specific" acts of persecution, such as whipping, beating, or killing others, as Friedrich suggests.
Under the RRA's predecessor statute, the DPA, refugees were denied visas based on their membership in a group "hostile to the United States." The DPA as enacted in 1948 limited visas to those persons who were defined as refugees by the IRO; the IRO explicitly excluded from the definition of refugees persons who "assisted the enemy in persecuting civil populations." Fedorenko, 449 U.S. at 496 nn. 3, 4, 101 S.Ct. 737. The DPA was amended in 1950 to state:
[n]o visas shall be issued under the provisions of this Act ... [1] to any person who is or has been a member of or participant in any movement hostile to the United States ..., or [2] to any person who advocated or assisted in the persecution of any person because of race, religion, or national origin.
United States v. Koreh, 59 F.3d 431, 438 (3rd Cir.1995) (quoting DPA § 13, 64 Stat. at 227) (numbers added). The "hostile movement" prohibition did not require proof of personal participation in acts hostile to the United States; voluntary membership in an organization hostile to the United States, regardless of the degree of the individual's participation, was sufficient to disqualify an individual from obtaining a visa under the DPA. Id. at 444-45 (citing United States v. Osidach, 513 F.Supp. 51 (E.D.Pa.1981)).
The RRA, enacted in 1953, (1) deleted the "hostile movement" disqualification and (2) added the word "personally" to the provision disqualifying those who "advocated or assisted in persecution." The effect of the first of these modifications was to remove the prohibition against issuing visas to aliens based solely upon their membership *1107 in organizations deemed hostile to the United States. The second modification emphasized the first by explicitly stating the ineligibility of those who individually advocated or assisted in the persecution. See H.R.Rep. No. 1452, 95th Cong., 2d Sess. at 5 (1978) (Report on the Holtzman Amendment to the Immigration and Nationality Act) ("Section 13 of the Displaced Persons Act of 1948, ..., and Section 14(a) of the Refugee Relief Act of 1953 prohibited the admission of aliens under those statutes who had `advocated or assisted in the persecution of any person ... because of race, religion or national origin.'").[3]
The Court finds no support for Friedrich's argument that by adding the word "personally" to the RRA, Congress intended to require a showing of his subjective intent to persecute or that he engaged in acts causing specific harm to individuals. Friedrich served as an armed guard at three concentration camps housing civilians imprisoned under inhumane conditions based upon their race, religion or national origin. His job was to make sure they remained imprisoned. Friedrich's service, even in the absence of any evidence that he personally committed atrocities against these individuals, qualifies as "advocat[ing] or assist[ing] in persecution." United States v. Szehinskyj, 277 F.3d 331, 339 (3d Cir.2002) ("By definition  and ... clear, unequivocal, and convincing evidence  the Totenkopf [at Gross-Rosen] assisted in the persecution of Jews and others considered racially inferior." (internal quotations omitted)). See also Naujalis v. INS, 240 F.3d 642, 647 (7th Cir.2001) (Lithuanian soldier who admitted guarding vital railroad facility assisted Nazi-directed persecution); Schmidt, 923 F.2d at 1258 ("[I]t is clear that service as an armed concentration camp guard constitutes assisting in persecution under the DPA."); Schellong v. INS, 805 F.2d 655, 661 (7th Cir.1986); United States v. Kairys, 782 F.2d 1374, 1377 n. 3 (7th Cir.1986) (service as Nazi concentration camp guard, without proof of personal involvement in atrocities, established persecution for purposes of DPA).
Friedrich also suggests that, under Chevron v. Natural Resources Defense Council, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the Court must give deference to the eligibility decision of the vice consul who issued his visa. Under Chevron, courts "defer to the reasonable judgments of agencies with regard to the meaning of ambiguous terms in statutes that they are charged with administering." Pelofsky v. Wallace, 102 F.3d 350, 353 (8th Cir.1996) (quoting Smiley v. Citibank (South Dakota), N.A., 517 U.S. 735, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996)). "The plain meaning of a statute controls, if there is one, regardless of an agency's interpretation." Hennepin County Med. Ctr. v. Shalala, 81 F.3d 743, 748 (8th Cir.1996). This case does not require the Court to review the formal decision of the State Department regarding the interpretation of a vague statute following formal administrative proceedings. What is at issue here is the vice consul's decision regarding the proper application of an unambiguous statute to an individual who failed to provide *1108 complete factual information. Chevron does not apply under these circumstances.
Friedrich argues that citizenship is not necessarily illegally procured because an individual received "an otherwise valid visa" under improper circumstances. He cites In re Ayala-Arevalo, No. A42989249, 1998 WL 833810 (BIA Nov. 30, 1998), in support of this position. Ayala-Arevalo involved an alien's attempt to obtain relief from deportation after he was found to be excludable at entry as a result of a fraud conviction. Id. at 1998 WL 833810, *3. Ayala-Arevalo argued that he was entitled to a waiver of inadmissibility under § 212(h) of the INA, 8 U.S.C. § 1182(h), because, he said, the Act distinguished between (a) persons who were lawfully admitted but later determined to have concealed their inadmissibility and (b) persons who were indeed lawfully admitted. The Board of Immigration Appeals (BIA) declined to make the requested distinction between the categories of those "lawfully admitted." The statute at issue in Ayala-Arevalo and the BIA's analysis simply have no bearing on this case. See United States v. Negele, No. 4:97-CV-1810 (ERW) (E.D.Mo. Feb. 26, 1999), at 9 n. 4 (rejecting argument that BIA findings regarding waiver of inadmissibility found at 8 U.S.C. § 1182(h) were applicable in making determination regarding visa eligibility under DPA).
In summary, the Court concludes that Friedrich's service as a concentration camp guard while serving in the Waffen SS rendered him ineligible for the visa he obtained pursuant to the RRA. As a consequence, Friedrich was not lawfully admitted to the United States and the order admitting him to citizenship and the certificate of naturalization were illegally procured under 8 U.S.C. § 1451(a).
Accordingly,
IT IS HEREBY ORDERED that the government's motion for summary judgment [# 22] is granted.
IT IS FURTHER ORDERED that the order of this Court dated May 4, 1962, admitting defendant Adam Friedrich to United States citizenship, is revoked and set aside, and Naturalization Certificate No. 8497460, issued on May 4, 1962, to defendant Adam Friedrich, is canceled.
IT IS FURTHER ORDERED that, upon receipt of this order, defendant Adam Friedrich shall surrender Naturalization Certificate No. 8497460 and his United States passport, if he has one, to the Attorney General.
A separate judgment in accordance with this memorandum and order shall be entered this same date.
NOTES
[1] The horrors inflicted by the Third Reich on civilians imprisoned in concentration camps based upon their race, religion, national origin and other immutable characteristics are well documented in the record submitted by the government in this case, in the case law, in history, and in the memories of those who survived. Friedrich does not contest the factual record in this regard. The Court chooses not to recapitulate the facts except insofar as necessary to resolve the issue before it.
[2] Friedrich's argument that the Court should deny summary judgment based upon the reasoning in United States v. Negele, No. 4:97-CV-1810 (E.D.Mo. Mar. 31, 1999), is unavailing. In that case, the government sought denaturalization under the misrepresentation prong of § 1451(a). The district court concluded that material factual disputes regarding what Negele told the visa examiners precluded summary judgment.
[3] The purpose of the Holtzman Amendment was to ensure that the INA excluded from admission, and facilitated the deportation of, "any aliens who have persecuted any person on the basis of race, religion, national origin, or political opinion." H.R.Rep. No. 1452 at 1. The vast majority of naturalized citizens determined to be Nazi war criminals were deportable as having concealed material facts in applying for visas under the DPA or RRA. Id. at 3. However, at least two such war criminals had been admitted under the INA of 1952, which did not expressly preclude admission based upon persecution. Id. at 2-3. These individuals thus were not deportable under existing law.