# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-3522

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | Appeal from the United States |
| | * | District Court for the |
| v. | * | Eastern District of Missouri |
| | * | |
| Michael Negele, | * | [PUBLISHED] |
| | * | |
| Appellant. | * | |

_____

Submitted: May 11, 2000

Filed: August 17, 2000

_____

Before RICHARD S. ARNOLD, HANSEN, and BYE, Circuit Judges.

_____

BYE, Circuit Judge.

In one of the most deplorable and grotesque chapters in human history, the Third Reich exterminated vast populations based upon their racial, ethnic, and religious characteristics. As this appeal demonstrates, that genocide continues to affect lives even today. The district court[1] revoked Michael Negele's United States citizenship, finding that Negele misrepresented his war record as a Nazi concentration camp guard

_____

[1]The Honorable E. Richard Webber, United States District Judge for the Eastern District of Missouri.

in order to obtain citizenship in this country.  Negele challenges the adverse judgment on both jurisdictional and substantive grounds.  We affirm.

## BACKGROUND

Negele, ethnically German, was born in Romania in 1920.  In 1942, the Romanian Army drafted Negele into service.  In 1943, he moved from the Romanian Army to the German *Schutzstaffel*, ubiquitously shortened to SS.[2]  The SS, an organ of the Nazi party, acted as the federal police force in Germany.  One part of the SS was called the Waffen SS; in German, *waffen* means "armed."  The Waffen SS was further subdivided into two wings.  One wing trained as a military formation, somewhat akin to the standing German army.  The other wing, the Death's Head unit, operated and guarded the concentration camps.  Negele joined the Waffen SS as a Death's Head guard.  From 1943 to 1944, he guarded civilian prisoners at the Sachsenhausen concentration camp near Berlin.

The Sachsenhausen camp obtained the labor of prisoners before they died.  The camp essentially worked prisoners to death.  Death's Head guards at Sachsenhausen kept track of prisoners, guarded the slave-labor detail outside the camp, and brought the prisoners back to the camp at night.  Guards were trained to perform various duties.  They received weapons instruction in rifles and pistols, drill instruction, ideological indoctrination, instruction in identifying and guarding prisoners and loading and unloading prisoners from trains.  The guards at Sachsenhausen were instructed to shoot prisoners who attempted to escape the camp.

---

[2]The district court found, based upon overwhelming historical evidence, that the SS and the German army were wholly separate and distinct organizations.

Negele received special training with guard dogs beginning at Sachsenhausen. Death's Head guard dogs were used frequently around the prisoner work details. The Waffen SS trained dogs to attack prisoners when they attempted to escape.

In 1944, Negele was transferred (along with his guard dog) to Theresienstadt, a Jewish ghetto located in the former Czechoslovakia. Theresienstadt operated as an internment camp that held Jews and other prisoners awaiting transport to the death camps. Starvation and disease killed thousands of prisoners in Theresienstadt. Negele policed the exterior of the ghetto, attempting to prevent prisoner escapes. Guards at Theresienstadt also ensured the transport of prisoners to the trains destined for Auschwitz and other death camps.

In May 1945, as the Russian army advanced on Theresienstadt from the east, Negele and other guards rid their SS uniforms of all markings that linked them to the Death's Head unit. Negele discarded his SS identification card and uniform badge. As a result, the Russians never discovered Negele's participation in the Waffen SS. Negele was held as a prisoner of war until August 1945. He then lived in various towns in Germany until 1948. Negele ultimately traveled to Stuttgart, where he applied for an immigration visa to the United States.

In Stuttgart, Negele completed the application for an immigration visa with the aid of a clerk. The clerk asked Negele questions in German, then typed his responses onto the application form in English. When the clerk asked Negele about his wartime residences, Negele told the clerk he served in the "Romanian Army" and the "German Army." Negele did not disclose his service in the Waffen SS.[3] The application process required an applicant to sign the application after an interview with the vice consul, and

---

[3]At trial, Negele indicated that no one asked him about his involvement in the Waffen SS, including the clerk who translated the application on his behalf.

swear to the truthfulness of the application information. Negele never changed his answers about his war record, and he ultimately signed the application.

On February 23, 1950, the government granted Negele an immigrant visa. Less than one month later, on March 22, 1950, Negele arrived in New York. On September 9, 1955, the Eastern District of Missouri granted Negele's petition for naturalization. Negele worked in the aircraft industry until his retirement in 1986. Negele now resides in St. Peters, Missouri.

The government filed a three-count complaint seeking to revoke Negele's citizenship in September 1997. Any one of the counts, if proven, entitled the government to denaturalize Negele. The district court held a bench trial in mid-April 1999. The court's findings of fact and conclusions of law credited the testimony of an expert witness[4] who opined that Waffen SS Death's Head guards were automatically rejected for immigration, whether they served voluntarily or not.[5] The court also relied upon the government's documentary evidence showing that the United States categorically rejected individuals because of their service in the Waffen SS Death's Head guard battalion at Sachsenhausen. Consequently, the court determined that Negele was ineligible for an immigration visa, and therefore ineligible for citizenship. On July 20, 1999, the court issued a comprehensive ninety-page memorandum opinion, entered judgment against Negele, and revoked his citizenship. Negele now appeals.

---

[4]Dr. James Crosby worked for several years in the United States Displaced Persons Commission (DPC). He was stationed in Europe, where he processed many visas.

[5]Negele relied upon his own expert, James McDonald, who served in the DPC as a case analyst approving refugee applications. On cross-examination, McDonald admitted that he had previously testified in another case that Waffen SS Death's Head guards were automatically rejected for immigration visas. The district court properly discredited McDonald's direct testimony to the contrary.

## DISCUSSION

## A.    Subject Matter Jurisdiction

Negele challenges our exercise of jurisdiction.  We must resolve jurisdictional questions first.  See Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 95 (1998).  Most of Negele's jurisdictional arguments lack merit.  We therefore limit our discussion to two points that deserve consideration.

The Immigration and Nationality Act of 1952 provides, *inter alia*, that the government shall

> institute proceedings in any district court . . . for the purpose of revoking and setting aside the order admitting [a] person to citizenship and canceling the certificate of naturalization on the ground that such order and certificate of naturalization were illegally procured or were procured by concealment of a material fact or by willful misrepresentation . . . .

8 U.S.C. § 1451(a).

Section 1451(a) confers authority on the federal courts to hear revocation of citizenship actions brought by the government.  Negele objects, apparently on the ground that he did not illegally procure the naturalization order.  Insofar as Negele's objection is jurisdictional in character, the objection is unfounded.  The government bears the burden of proving at trial that Negele illegally procured his citizenship.  That is an "element of the offense," so to speak.  If the government failed to prove illegal procurement, the district court would not be divested of jurisdiction.  Rather, the district court would enter judgment for Negele because the government failed to prove a critical portion of its case.  Negele's challenge is properly regarded as a substantive claim of error, rather than a jurisdictional challenge.

Negele also contends that an Article III court may not examine his visa eligibility. Such review would, he contends, amount to an "unconstitutional judicial encroachment into an exclusive Executive function . . . violat[ing] the constitutional doctrine of Separation of Powers." Negele's argument is specious. The Constitution endows Congress with the power to prescribe rules for securing naturalization. See U.S. Const. art. I, § 8, cl. 4. When Congress lawfully delegates responsibility to the executive branch, the executive's activities may be scrutinized by the judiciary to ensure that the executive acts within the scope of its proper authority. Cf. INS v. Chadha, 462 U.S. 919, 953 n.16 (1983) ("[executive action under legislatively delegated authority] is always subject to check by the terms of the legislation that authorized it; and if that authority is exceeded it is open to judicial review").

## B.     Negele's Substantive Claims of Error

The government's complaint alleged three separate violations of the immigration laws, each sufficient to revoke Negele's citizenship if so proven. The district court held in favor of the government with respect to each of the three counts. Negele offers a melange of arguments contesting the district court's legal conclusions.

We begin with the first count, in which the government alleged that Negele entered the United States in violation of the Displaced Persons Act (DPA), the law in operation when Negele emigrated. The DPA provided that

> [n]o visas shall be issued under the provisions of this Act to any person who is or has been a member of, or participated in, any *movement which is or has been hostile to the United States* or the form of government of the United States.

DPA, ch. 647, § 13, 62 Stat. 1009, 1014 (1948) (emphasis added).

-6-

Negele conceded at trial that he had served in the Waffen SS Death's Head guard unit, both at Sachsenhausen and at Theresienstadt. The district court concluded that Negele's service in the Waffen SS constituted membership or participation in a "movement . . . hostile to the United States." Several courts have determined that concentration camp guards participated in a movement hostile to the United States. See, e.g., United States v. Breyer, 41 F.3d 884, 890 (3d Cir. 1994) (collecting cases). We likewise conclude that Negele's service in the Waffen SS Death's Head unit constituted membership and participation in a movement hostile to the United States. Hence, Negele was ineligible for an immigration visa under the terms of the DPA.

Because Negele was ineligible to receive an immigration visa, Negele entered this country with an invalid visa. By entering the United States without a valid entry visa, Negele failed to gain lawful admission to the United States. See 8 U.S.C. § 1181(a)(1); Fedorenko v. United States, 449 U.S. 490, 514-15 (1981). Because an individual may not be naturalized unless he has first been lawfully admitted for permanent residence, see 8 U.S.C. § 1427(a)(1), Negele procured his citizenship illegally, see id. § 1451(a).

Although the government bears a "heavy burden" of proof in a revocation of citizenship proceeding, see Fedorenko, 449 U.S. at 505 (quoting Costello v. United States, 365 U.S. 265, 269 (1961)), a prospective citizen must strictly comply with "all the congressionally imposed prerequisites to the acquisition of citizenship." Fedorenko, 449 U.S. at 506. Negele did not "strictly comply" with the prerequisites to naturalization. He entered the country illegally; as a consequence, the resulting court order granting him citizenship was invalid.

The district court properly revoked the order granting Negele citizenship, and properly canceled Negele's certificate of naturalization. We therefore affirm the district court's judgment on Count I. Because each count in the government's complaint is

independently sufficient to sustain the district court's judgment, we need not analyze Counts II and III.  See Tittjung v. Reno, 199 F.3d 393, 397-98 (7th Cir. 2000).

AFFIRMED.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.