**UNITED STATES of America,
Plaintiff,**

v.

**Iwan MANDYCZ, Defendant.**

**No. CIV. 00–40148.**

United States District Court,
E.D. Michigan,
Southern Division.

Feb. 28, 2005.

See, also, 321 F. Supp.2d 862.

Robert W. Haviland, U.S. Attorney's Offices, Flint, MI, Jonathan Drimmer, U.S. Department of Justice Office of Special Investigations, Washington, DC, for Plaintiff.

Katherine A. Jarred, Ward, Anderson, Bloomfield Hills, MI, Andrew J. Haliw, Joseph A. Siciliano, Tracy S. Thomas, Haliw, Siciliano, Richard P. Zipser, Farmington Hills, MI, for Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GADOLA, District Judge.

### I. INTRODUCTION

On June 14, 2004 to June 18, 2004, the Court conducted a bench trial in this case. The parties each submitted post-trial

briefs and proposed findings of fact and conclusions of law in July 2004. The Court now issues its findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. These findings of fact and conclusions of law represent the Court's consideration of all of the admissible evidence in light of the pertinent law, the Court's observation of the witnesses, and its evaluation of their demeanor, qualifications, and credibility. *See Seal–Flex, Inc. v. W.R. Dougherty & Assocs., Inc.,* 254 F.Supp.2d 647, 649 (E.D.Mich.2003) (Gadola, J.). The citations after each proposition support the finding. The Court notes that the voluminous exhibits in this case corroborate the Court's findings in numerous respects. Consequently, the citations chosen should not be considered the sole supporting material, but are rather exemplary of the evidence available.

Every finding of fact that may be construed to incorporate a conclusion of law is adopted as a conclusion of law. *See id.* Every conclusion of law that may be construed to incorporate a finding of fact is adopted as a finding of fact. *See id.* The subheadings used are for convenience only. *See id.* If a finding of fact or conclusion of law is pertinent to any determination other than that indicated by the heading under which it appears, it is adopted as a finding of fact or conclusion of law applicable to such other determination or determinations as may be appropriate. *See id.*

## II. FINDINGS OF FACT

### A. *Background and the Service of Guard 3308*

1. At the outset, the Court finds the testimony and credentials of expert historian Dr. Peter Black to be credible.

2. The *Schutzstaffel* ("SS") was the elite guard and intelligence unit of the Nazi Party of Germany. (Tr. 6–14 [1], at 119–21).

3. Trawniki Training Camp was a facility established and operated by the SS and the German police. (Tr. 6–14, at 130–35).

4. Trawniki Training Camp was located outside the village of Trawniki in the Lublin District of the Government General. (GX 36; GX 71; Tr. 6–14, at 122, 130).

5. Men who trained at the Trawniki Training Camp became members of the Guard Forces (*Wachmannschaften*) of the SS and Police Leader in Lublin District. (Tr. 6–14, at 130, 191; GX 25 at 41).

6. At Trawniki, the term *Wachmann* was a rank meaning "guard private." The German word "Wachmann" translates literally to the English word "guard." (Tr. 6–14, at 138).

7. Training at Trawniki Training Camp lasted approximately six to eight weeks. It consisted of military drills, weapons instruction, guard training, and instruction on German commands. The Trawniki men were trained for police duty, guard duty, and prison transport escort work. (GX 34 at 4; GX 79 at 6; GX 84 at 4; GX 85 at 2; Tr. 6–14, at 152–53).

8. "Operation Reinhard" was the Nazi campaign to exploit and exterminate Jews in Poland. (Tr. 6–14, at 129–34).

9. Under Operation Reinhard, an estimated 1.7 million Polish Jews were killed, Jewish labor was exploited in labor camps under armed guard, and Jewish property and personal belong-

---

1. The Trial Transcripts are referenced by month and day. Government exhibits are referred to as "GX," and defense exhibits as "DX."

ings were stolen and distributed to benefit the German economy. (GX 37; GX 73; Tr. 6–14, 123, 129–34).

10. The Guard Forces and its Trawniki-trained guards participated in and were essential to the implementation of Operation Reinhard. (Tr. 6–14, at 132–34).

11. In 1942, the Germans had established a forced labor camp for Jews adjacent to the Trawniki Training Camp. This forced labor camp was known as the "Trawniki Labor Camp." (GX 71; Tr. 6–14, at 153–54).

12. Trawniki Labor Camp was an Operation Reinhard forced labor camp. (GX 73).

13. The number of prisoners at the Trawniki Labor Camp increased significantly in the spring of 1943, as the Warsaw ghetto was liquidated in April 1943 and its inhabitants were sent to Trawniki, among other locations. (Tr. 6–14, at 153–54).

14. As part of Operation Reinhard, the Nazis pressured Fritz Emil Schultz, one of the two largest employers in the Warsaw ghetto, to relocate his fur-production and brush-making plants to Trawniki. To staff those factories, the SS deported a total of 5,656 Jews (2,949 men, 2,323 women, and 384 children) from the Warsaw ghetto to the Trawniki Labor Camp. (GX 25 at 48–49; Tr. 6–14, at 153–62).

15. The prisoners at Trawniki Labor Camp performed forced labor, lived in difficult conditions and under a justified fear of death. (GX 25 at 48–49; GX 78 at 3; GX 80 at 3; GX 81 at 10; Tr. 6–14, at 153–62).

16. From the time its first Jewish prisoners arrived in summer 1942 until November 1943, the Trawniki Labor Camp was guarded by Trawniki-trained guards, who prevented the prisoners from escaping. (Tr. 6–14, at 153, 163).

17. At no time during the existence of the Trawniki Labor Camp did trainees at the training camp perform only non-guarding functions; all men either guarded the labor camp when needed, or were involved in supervising others who guarded. (Tr. 6–15 (afternoon), at 62).

18. As a matter of standard procedure, all *Wachmanner* who arrived at Trawniki Training Camp, including those in April 1943, received practical, hands-on training by guarding the Trawniki Labor Camp and prevented the prisoners from escaping during their period of training. (GX 32 at 3; GX 79 at 4–5; GX 80 at 2; GX 84 at 4–5; GX 85 at 3–4; Tr. 6–14, 153–54, 163–69).

19. The trainees performed this guard duty while armed with rifles. (GX 80 at 3; Tr. 6–14, at 163).

20. Trawniki men were eligible for promotions, paid, granted leave, and received other benefits. (Tr. 6–14, at 138–39, 191).

21. Clerks at Trawniki and Operation Reinhard camps created many contemporaneous documents concerning Trawniki personnel, including transfer rosters and personnel files, which were retained in the ordinary course of the enterprise. (Tr. 6–14, at 140–43, 171–72).

22. Clerks at Trawniki prepared personnel files that contained the biographical information of each new recruit, using interpreters, if necessary, to complete the forms with information that the recruits provided. (Tr. 6–15 (morning), at 96–97; Tr. 6–17 (morning), at 14–15).

23. The recruits ordinarily signed the personnel forms and affixed their thumb print. (Tr. 6–14, at 141; *e.g.*, GX 39–57).

24. All newly arrived recruits at Trawniki received permanent personnel identification numbers. (Tr. 6–14, at 137).

25. A Trawniki guard's personnel identification number was unique, and remained with him throughout his service. A number was not reassigned, even if the recipient died, deserted, or otherwise left service. (Tr. 6–14, at 136–37).

26. Upon his arrival at Trawniki, a personnel file was created for Guard 3308. (Tr. 6–14, at 144).

27. Approximately 1,200 of the 5,082 personnel files that were created survived the war. (Tr. 6–17 (morning), at 16).

28. The personnel file for Guard 3308 was not among the personnel files that survived the war. (Tr. 6–14, at 144).

29. Guard 3308 arrived at Trawniki Training Camp on or about April 7, 1943. (Tr. 6–14, at 145–46). Guard 3308's arrival date is established by his identification number, which falls within a block of numbers known to have been assigned on or about April 7, 1943, as corroborated by (1) all extant Trawniki personnel files with numbers between 3301 and 3399; (2) the listing of Guard 3308 on a subsequent transfer roster, which is consistent with the completion of the standard period of training; and (3) the postwar recollections of other Trawniki men with numbers between 3301 and 3400, who stated that they arrived in April 1943. (GX 32–34, 58, 60; Tr. 6–14, at 145–52).

30. Guard 3308 was inducted into the Guard Forces [*Wachmannschaften*] of the SS and Police Leader in Lublin District. He was assigned the rank of *Wachmann* (guard private). (GX 26 at entry 8; GX 27 at entry 71; GX 28 at entry 10; Tr. 6–14, at 137–38).

31. After his arrival at Trawniki, Guard 3308 underwent the standard training regimen at Trawniki, which included military drills, weapons training, learning German commands, and learning how to arrest, guard, and escort prisoners. (Tr. 6–14, at 152–53).

32. During his training, Guard 3308 guarded prisoners at the Trawniki Labor Camp, while armed with a rifle. (Tr. 6–14, at 170–71; Tr. 6–15 (morning), at 54).

33. On or about May 25, 1943, a contingent of guards was transferred from the Trawniki Training Camp to the Poniatowa Labor Camp. (GX 26; Tr. 6–14, at 175, 196–99).

34. The Poniatowa Labor Camp was a Jewish forced labor camp established in Poniatowa, Poland in fall 1942, and remained in operation until November 1943, and was a part of Operation Reinhard. (GX 25 at 55; GX 73; Tr. 6–14, at 173–75).

35. Government Exhibit 26 is a roster dated May 25, 1943, documenting the transfer of men from the Trawniki Training Camp to serve as guards of the Poniatowa Labor Camp. (GX 26).

36. Guard 3308 was among the contingent transferred from Trawniki to Poniatowa on May 25, 1943, and he appears on the May 25, 1943 roster at entry eight, as "Iwan Manditsch" with the rank of *Wachmann*. (GX 26).

37. The roster reflecting this transfer, as well the two other rosters addressed subsequently, were created by Ger-

man wartime agencies to document the movement of Trawniki-trained guards. They were created by a clerk with knowledge of the personnel being transferred, at or near the time of the transfers. The rosters were made and retained in the regular course of Trawniki's enterprise. (GX 26–28; Tr. 6–14, at 171–72, 187).

38. The May 25 roster was signed by an Order Police Official named Heinze. Independent historical evidence corroborates that Heinze served at Trawniki at the time he signed the May 25 roster. (Tr. 6–14, at 172–73).

39. Independent historical evidence, summarized on GX 94, corroborates that the men listed on the May 25 roster arrived at Poniatowa and served there. (GX 27, 32–34, 39–57, 60, 94, 95, 105, 109; Tr. 6–14, at 181–86).

40. After spring 1943, Poniatowa primarily exploited the labor of Jews deported from the Warsaw ghetto. Between February and July 1943, between 11,000 and 15,000 Jews arrived at Poniatowa from Warsaw and other locations. (Tr. 6–14, at 173–75).

41. Most of these prisoners produced clothing for the Többens company, which, like Schultz, had relocated from the Warsaw ghetto. (GX 90; Tr. 6–14, at 173–75).

42. Other prisoners worked outside the factory grounds, laboring on such projects as constructing barracks and roads, digging ditches, clearing trees, and working in a stone quarry. (GX 25 at 55–57, 72–73; GX 91 at 3; Tr. 6–14, at 178–80).

43. While a small number of Jews lived a few hundred yards away from the main camp in a row of housing blocks known as the "Settlement," most of the prisoners lived at the factory site.

(GX 25 at 55–57; GX 87; GX 88; Tr. 6–14, at 175–76, 179–80).

44. By June 1943, a new camp command was installed at Poniatowa, and conditions became harsher for the prisoners. (Tr. 6–14, at 175–76).

45. Prisoners had little food and were beaten or killed by guards for minor transgressions. (GX 91 at 4; GX 101 at 2; Tr. 6–14, at 179–80).

46. Trawniki-trained men served as guards at the Poniatowa Labor Camp and prevented the prisoners from escaping. (GX 79 at 7; GX 97 at 3; GX 99 at 2; GX 100 at 2; GX 113 at 2; Tr. 6–14, at 175, 180, 196–200; Tr. 6–15 (morning), at 8–17).

47. These guards were assigned in a rotation that included: manning watchtowers around the camp, patrolling between two parallel, barbed-wire fences that surrounded the labor camp, guarding the "Settlement," performing sentry duty at the camp entrances, and escorting to work those prisoners not employed in the Többens factory and guarding them at the work sites. (GX 25 at 70–71; 79 at 7; Tr. 6–14, at 199–200).

48. If a Trawniki-trained guard at Poniatowa were found to be physically unable or unsuitable to perform guard duty, he was discharged and released from service. (GX 102 at 3–5; Tr. 6–15 (morning), at 15).

49. From approximately May 25, 1943 to approximately November 17, 1943, Guard 3308 served as an armed guard at the Poniatowa Labor Camp, preventing prisoners from escaping and compelling them to perform forced labor. (Tr. 6–14, at 194; Tr. 6–15 (morning), at 19, 28, 54–55).

50. In November 1943, the Germans completed Operation Reinhard with a massacre of thousands of Jewish forced laborers at various locations in the Government General, conducted under the code name "Operation Harvest Festival" (*Erntefest*). (Tr. 6–15 (morning), at 20–21).

51. On November 3, 1943, SS and police forces shot the approximately 6,000 prisoners at the Trawniki Labor Camp, whom Guard 3308 had guarded six months earlier. (Tr. 6–14, at 157; Tr. 6–15 (morning), at 20–21, 22–25).

52. On the night of November 3, 1943, SS and police forces surrounded the camp at Poniatowa. The next day, these men ordered the Jewish prisoners to undress, marched them to open pits, and killed the approximately 12,000–16,000 Jewish inmates then alive at Poniatowa. (GX 101 at 2; GX 106 at 19–20; GX 108 at 5–8; Tr. 6–15 (morning), at 21).

53. Some prisoners who resisted at Poniatowa were burned alive in their barracks. (GX 111 at 4–5; Tr. 6–15 (morning), at 21).

54. In all, approximately 40,000 to 42,000 prisoners were killed during Operation Harvest Festival, which was the largest single shooting execution of the entire Final Solution. (Tr. 6–15 (morning), at 21–23).

55. The Trawniki-trained guard contingent posted at Poniatowa did not themselves take part in shooting prisoners, but assisted the operation in a variety of ways, including performing their normal guard duty around the perimeter of the camp. Participants and Polish witnesses also variously recalled that the Trawniki-trained guards stood in a cordon and escorted Jews from the Settlement to the main camp to join the other prisoners, among other tasks. (GX 25 at 79–81; GX 105 at 4–7; GX 112 at 1; Tr. 6–15 (morning), at 21, 26).

56. The bodies were subsequently burned on make-shift outdoor pyres. (GX 105 at 6; GX 108 at 8–9; Tr. 6–15 (morning), at 27; GX 101 at 2; GX 113 at 2).

57. Although there is no evidence that Guard 3308 was on duty during Harvest Festival, he guarded the Jewish prisoners for six months until they were killed on November 4, 1943, and remained assigned to the camp as the bodies were burned. (Tr. 6–15 (morning), at 27–28).

58. Following the massacre of most of the prisoners at Poniatowa, the need for guards was greatly reduced. On November 17, 1943, the majority of the Trawniki guard contingent was transferred back to Trawniki. (GX 27; Tr. 6–14, at 184–88, 192; Tr. 6–15 (morning), at 28).

59. Government Exhibit 27 is a roster dated November 17, 1943, documenting the transfer of men back to Trawniki from Poniatowa. (GX 27; Tr. 6–14, at 186).

60. Guard 3308 was among this contingent, and he appears on a roster dated November 17, 1943, at number 71, as "Iwan Manntitsch," with the rank of *Wachmann*. (GX 27).

61. By the time that Guard 3308 was transferred back to Trawniki on November 17, the administrative jurisdiction for Trawniki and the Trawniki men had been shifted from the SS and Police Leader to the SS Economic and Administrative Main Office (WVHA). (Tr. 6–15 (morning), at 29).

62. As a result of the administrative transfer, many Trawniki-trained

guards left the Trawniki system and were assigned to SS Death's Head battalions at the WVHA concentration camps, including the Sachsenhausen Concentration Camp, located near the town of Oranienburg, northeast of Berlin. Sachsenhausen served as a transit point for Trawniki-trained guards being deployed throughout the concentration camp system. (Tr. 6–15 (morning), at 29–30).

63. On November 20, 1943, a contingent of Trawniki guards was assigned to be transferred to the SS Death's Head Guard Battalion Sachsenhausen. (GX 28; Tr. 6–14, at 88).

64. Government Exhibit 28 is a roster dated November 20, 1943, documenting the transfer of men from Trawniki to the Sachsenhausen Concentration Camp in Germany. (GX 28; Tr. 6–14, at 88–89).

65. Guard 3308 was among this contingent, and he appears on the roster dated November 20, 1943 at entry number 10, as "Iwan Mandytsch," the rank of *Wachmann,* a birth date of January 23, 1920, and a birth place of Olievo–Korolivka, Horodenko Rayon. (GX 28).

66. Although reliable corroborative evidence demonstrates that Guard 3308 and the other men on the November 20 roster were sent from Trawniki to Sachsenhausen, the evidence is inconclusive as to whether Guard 3308 actually reached Sachsenhausen. (Tr. 6–15 (morning), at 32–36; Tr. 6–15 (afternoon), at 64).

67. Guard 3308's transfer out of Trawniki to Sachsenhausen severed his ties to the Guard Forces of the SS and Police Leader in Lublin. (Tr. 6–15 (morning), at 34).

68. Guard 3308 was, therefore, a member of the Guard Forces of the SS and Police Leader in Lublin from approximately April 7, 1943, until November 20, 1943. (Tr. 6–15 (morning), at 54).

69. Because the May 25, November 17, and November 20 rosters all list a guard with the same unique identification number "3308," a last name of "Manditsch," "Manntitsch," and "Mandytsch," which sound alike phonetically, the same first name "Iwan," the same rank of *"Wachmann,"* and who was transferred between camps in a reasonable manner consistent with the historical evidence, they all refer to the same man. (GX 26–28; Tr. 6–14, at 107–08, 192–93).

70. Guard 3308 was named Iwan "Mandytsch" (spelled phonetically), was born on January 23, 1920, and was born in Olievo–Korolivka, Horodenko Rayon. (GX 26–28).

B. *Identifying Defendant and Guard 3308*

71. Defendant's first name, Iwan, matches that of guard 3308. (GX 26–28).

72. Defendant was born in Olievo–Korolivka, which was the birthplace of Guard 3308. (*Compare* Stip. Fact (1) at docket entry 115 *with* GX 28 at entry 10; *see also* GX 30; Tr. 6–14, at 77–79).

73. The SS and police officials conducted a drive for men to serve in guard units in East Galicia and the Horodenka region, the birthplace of Defendant and Guard 3308, in the late winter and early spring of 1943. (Tr. 6–14, at 147–48).

74. Guard 3308's arrival date corresponds with arrivals of recruits from Defendant's birthplace, the Horodenka re-

gion. (GX 32–34, 58, 60; Tr. 6–14, at 145–52).

75. The Government of Ukraine has officially certified that one Iwan Mandych was born on January 23, 1920, in Olievo–Korolivka, to parents named Dmytro and Mariya Skits'ko Mandycz. (GX 30).

76. In connection with his application for an immigrant visa to enter the United States, Defendant presented a church birth record, purportedly issued on March 15, 1943 (DX 1). That document lists Defendant's date of birth as July 23, 1920, exactly six months later than the birth date of Guard 3308 and the official Ukrainian records for Iwan Mandycz. (GX 7).

77. Forensic testing on Defendant's church birth record reveals that the stamp impression was created using multiple stamp operations and inks, and that portions of the printed lettering were re-touched by hand, using multiple inks. (Tr. 6–17 (afternoon) at 35–36, 38–48).

78. Legitimate stamp impressions do not contain such anomalies. (Tr. 6–17 (afternoon) at 48–51).

79. The Court finds that the March 15, 1943, (DX 1) church birth record is not authentic. (Tr. 6–17 (afternoon); GX 30).

80. Defendant admits that his parents were named Dmytro and Maria. (Tr. 6–14, at 81).

81. Additionally, Defendant's immigration documents, for which Defendant supplied the information, state that Defendant's father's name is "Dmytro" and his mother's name is Maria "Skitska" or "Skidzka." (GX 7).

82. In some of Defendant's immigration documents his last name, Mandycz, is rendered "Mandytsch." (GX 7, at 21, 32–33).

83. The spelling "Mandytsch" that appears in Defendant's immigration documents is identical to the spelling of Guard 3308's last name, as listed on the November 20 roster (GX 28).

84. There is no evidence of the existence of a second "Iwan Mandycz" born in Olievo–Korolivka in 1920. (Tr. 6–17 (morning), at 61–62; GX 123 at 157).

85. Based on the inauthentic nature of Defendant's birth certificate and the certification from the Ukrainian Government that matches Defendant's biographical details in all aspects except the date of birth, the Court finds that Defendant's date of birth was January 23, 1920 (GX 30; ¶¶ 76–79).

86. Guard 3308 shares the same first name, the same last name, the same birthplace, and the same birth date as Defendant. (¶¶ 71, 72, 83, 85).

87. Guard 3308 is Defendant. (¶¶ 86, 84).

C. *Corroborating Evidence*

88. As discussed in the following findings, Defendant's post-war contacts and statements made by others corroborate and further bolster the finding that Guard 3308 is Defendant.

89. The three rosters (GX 26 at entry 76; GX 27 at entry 104; GX 28 at entry 43) each list a "Nikolai Petrustschak," with Trawniki identification number 3380 and the rank of *Wachmann.* (GX 26–28; Tr. 6–14, at 109).

90. The November 20 roster states that Petrustschak was born on April 7, 1924 in "Wikno." (GX 28 at entry 43; Tr. 6–14, at 94).

91. Because the three rosters each identify Petrustschak by the same first and last names, rank, and Trawniki identi-

fication number 3380, they all refer to the same man. (Tr. 6–14, at 192–93).

92. The name "Mykola" is the Ukrainian version of "Nikolai." (Tr. 6–14, at 94).

93. In 1949, Defendant listed a "Mykola Petruszczak," located at a sanatorium (a type of hospital) in Parsch, as a character reference on a questionnaire ("*Fragebogen*") he completed for the International Refugee Organization ("IRO"). (GX 5; Tr. 6–14, at 96–97).

94. An IRO form completed by Mykola Petrusczak corroborates that he was living in a hospital in Parsch in 1949. The form also states that Petrusczak was born on April 7, 1924, in Vikno, the same date and place as Guard 3380. (GX 9 at 34; Tr. 6–14, at 92–94).

95. The "Nikolai Petrustschak" listed on the three rosters as Guard 3380 is the "Mykola Petrusczak" who served as Defendant's post-war character reference. (GX 5; GX 9; GX 26–28).

96. Petrusczak advised the IRO that from April 7, 1943 until 1944, he worked for the Seyring Company in Vienna, and then worked in Pichl. (GX 4; Tr. 6–15 (morning), at 37–38).

97. Defendant also told the IRO that from 1943 to 1944 he worked for the Seuring Company in Vienna, and then worked in Pichl. (GX 5 at 6–7).

98. The Austrian Government has no record that Defendant worked in Austria as a forced laborer during the war, and no evidence was presented that a "Seuring" (or "Seyring") company existed during World War II. (GX 117; GX 119; Tr. 6–15 (morning), at 38–40; Tr. 6–15 (afternoon), at 71, 74–75; Tr. 6–17, at 66–67, 72–74).

99. In his deposition, Defendant denied that he ever worked in Vienna or at a Seuring factory during the war. (GX 123 at 119, 133).

100. The Court finds that the matching statements provided by Defendant and Petrusczak, when compared with the historical evidence, suggest that Defendant and Petrusczak fabricated a shared, false story of their whereabouts during World War II. (¶¶ 92–93, 95–97).

101. This post-war contact corroborates the identification of Defendant and Guard 3308. (¶¶ 87–99).

102. Defendant's identification with Guard 3308 is also corroborated by the postwar protocols of Stepan Perig, Ivan Sidorak, and Vasilij Gajdich. (GX 32–34, 60).

103. The protocols of Perig, Sidorak, and Gajdich were given to Soviet investigators. (GX 32–34, 60; Tr. 6–14, at 99).

104. Those protocols were created according to a method typically employed in many eastern and western European countries. Under this method, an individual questions a witness, and then produces a summary protocol that the witness corrects and then adopts through his signature or an oral acknowledgment. (Fed.R.Civ.P. 28(b) & Advisory Committee's Notes (1963 Amendments); Tr. 6–14, at 98–99; Tr. 6–15 (morning), at 78).

105. If information in post-war protocols given to Soviet investigators, or investigators from another country, can be corroborated by reliable evidence, the information can be relied upon to reach sound historical conclusions. (GX 25 at 8–9; Tr. 6–17 (morning), at 26–29, 48).

106. On March 15, 1948, and March 28, 1948, Stepan Perig provided signed protocols to Soviet investigators discussing his wartime whereabouts and activities. (GX 32; GX 33; Tr. 6–14, at 97).

107. In both protocols, Perig stated that he was from Olievo–Korolivka, the same hometown as Defendant. (GX 32 at 1; GX 33 at 1, Tr. 6–14, at 100).

108. In both protocols, Perig admitted serving at Trawniki and Poniatowa. (GX 32 at 2–3; GX 33 at 1–2; Tr. 6–14, at 107).

109. Perig is identified on the May 25 roster as "Stefan Perih," guard number 3324, corroborating his Trawniki and Poniatowa service. (GX 26 at entry 24; Tr. 6–14, at 107–08).

110. In both his March 15 and March 28 protocols, Perig stated that "Ivan Dmitrievich Mandych" served with him at Trawniki and Poniatowa, and was then transferred to Germany. (GX 32 at 5; GX 33 at 4; Tr. 6–14, at 100).

111. The name "Dmitrievich" represents a patronymic, which is based on the name of the father. (Tr. 6–14, at 100–01).

112. Because Defendant's father's name was Dmytro, his patronymic is "Dmitrievich." (Tr. 6–14, at 100–01).

113. In both his protocols, Perig recalled that Mandych's year of birth was 1920, that his place of birth was Olievo–Korolivka, and that Mandych's parents still resided in Olievo–Korolivka as of 1948. (GX 32 at 5; GX 33 at 4; Tr. 6–14, at 102–06).

114. In his deposition, Defendant also stated that his parents resided in Olievo–Korolivka after World War II. (GX 123 at 92).

115. According to official death certificates issued by the Government of Ukraine, Defendant's parents were alive in 1948, when Perig provided his protocols, and resided in Olievo–Korolivka until their deaths in the 1950's. (GX 132 & 133; Tr. 6–14, at 104–05).

116. Perig's post-war statements regarding Iwan Mandych corroborate the identification of Guard 3308 and Defendant. (¶¶ 105–114).

117. On December 9, 1947, Ivan Sidorak provided a signed statement to a Soviet investigator discussing his wartime whereabouts and activities. (GX 34; Tr. 6–14, at 109).

118. Sidorak admitted serving at Trawniki and Poniatowa. (GX 34).

119. Sidorak is identified on the three rosters (GX 26 at entry 12; GX 27 at entry 74; GX 28 at entry 13) with the identification number 3312, corroborating his Trawniki and Poniatowa service.

120. Sidorak stated that he served at Trawniki and Poniatowa with an "Ivan Mandych," who was born in 1920 in Olievo–Korolivka. (GX 34 at 6; Tr. 6–14, at 111).

121. Sidorak's post-war statements regarding Iwan Mandych corroborate the identification of Guard 3308 and Defendant. (¶¶ 117–20).

122. On August 28, 1948, Vasilij Gajdich provided a signed statement to a Soviet investigator discussing his wartime whereabouts and activities. (GX 60; Tr. 6–14, at 111–12).

123. Gajdich admitted serving at Trawniki and Poniatowa. (GX 60; Tr. 6–14, at 112).

124. Gajdich is identified on the three rosters (GX 26 at entry 19; GX 27 at entry 80; GX 28 at entry 19) with identification number 3319, corroborating his Trawniki and Poniatowa service.

125. Gajdich stated that he served with an "Ivan Mandich" at Trawniki and Poniatowa. (GX 60 at 3).

126. In 1995, Gajdich provided a statement to Canadian investigators in which he recalled serving at Trawniki with a man with the last name "Mandich," noting that the name was memorable because it sounded like his own name. (DX 21 at 4).

127. In 2000, Gajdich similarly told an attorney from the United States Government that he seemed to recall serving at Trawniki with a man named Mandycz, remembering that Mandycz was from Horodenko, and again noting that the name was memorable because it sounded like his own name. (DX 24 at 74–75).

128. In 2000, Gajdich denied having provided a protocol to Soviet investigators in 1948, and denied ever having served at Poniatowa. (DX 24 at 77–81; Tr. 6–15 (afternoon), at 58–59).

129. Gajdich also stated that, between spring 1943 and fall 1943, when German documents show that he was at Poniatowa, he was "nowhere" and "know[s] nothing more." (DX 24 at 77, 80; Tr. 6–17 (morning), at 9–10).

130. When confronted about his denials, Gajdich admitted, "Maybe I am not truthful. I am not denying that." (DX 24 at 80–81).

131. It is common for individuals to deny knowledge of or participation in atrocities, and because Gajdich was likely present at Poniatowa when approximately 14,000 Jewish prisoners were killed in a single day, his claim that he did not serve at the camp is consistent with that pattern. (Tr. 6–17 (morning), at 10–11).

132. In light of his admission that he might not be telling the truth in denying he provided a 1948 protocol, his claim that he was "nowhere" between spring and fall 1943 when German documents show him serving at Poniatowa, and the fact that in post-war protocols Nazi guards commonly distance themselves from atrocities, Gajdich's claims that he did not provide a protocol in 1948 and that he did not serve at Poniatowa are not credible. (¶¶ 128–29).

133. Gajdich's prior admission that he served at Trawniki and recollection of a man named "Mandich" corroborate the identification of Guard 3308 and Defendant. (DX 21; DX 24 at 74–75).

134. Defendant's identification with Guard 3308 is also corroborated by his post-war contacts with Petro Perih.

135. Petro Perih, or "Petr Perig," was recalled by both Ivan Sidorak and Stepan Perig, in separate post-war protocols, as having served with them. Sidorak identified Petro Perih as being from Olievo–Korolivka and serving at Trawniki and Poniatowa. (GX 34 at 7). Stepan Perig also remembered him as being from Olievo–Korolivka and serving at Trawniki. (GX 33 at 3–4; Tr. 6–15 (morning), at 44–46).

136. Canadian immigration documents for Petro Perih state that he was born on April 4, 1924 in Olievo–Korolivka. (GX 17; Tr. 6–15 (morning), at 47).

137. A July 2002 Canadian driver's license record for Petro Perih lists his birth date as April 4, 1924, and identifies his address as 437 Renforth Drive. (GX 18; Tr. 6–15 (morning), at 48).

138. A telephone book for Toronto lists a P. Perih as residing at 437 Renforth Drive, with the telephone number 416–620–9571. (GX 134A, 134B; Tr. 6–15 (morning), at 48).

139. Defendant has admitted that Petro Perih's telephone number is 416–620–9571. (GX 16 at 2).

140. On April 12, 2000, Defendant's telephone records show two calls to a Toronto telephone number of 416–620–9571. On April 13, 2000, Defendant's telephone records show another call to that number. (GX 20 at 11).

141. Petro Perih attended the wedding of Defendant's daughter. (GX 12 at 17; GX 13).

142. Defendant's post-war contacts with Petro Perih corroborate Defendant's identification with Guard 3308. (¶¶ 135–141).

143. In light of the documentary and corroborating evidence, the variance in physical descriptions of Iwan Mandycz provided in the interrogations are factually insignificant and unpersuasive.

144. Other men who served at Trawniki and Poniatowa failed to identify Defendant in post-war statements, or did not recall Defendant's name (or the names of many others) in interviews. (DX 7–23; GX 79, 84, 109, 110; Tr. 6–15 (afternoon), at 8, 11, 13, 15–16, 20–21, 34–35, 37, 47–51; Tr. 6–17 (morning), at 52, 60).

145. Those failed recollections do not impeach or overcome the corroborating evidence of the statements that do recall an Ivan Mandycz.

146. Defendant has suggested no reason, and none is apparent, that Soviet investigators would seek to falsely incriminate him for World War II conduct. (Tr. 6–17 (morning), at 47; *see also United States v. Stelmokas,* 100 F.3d 302, 313 (3d Cir.1996); *United States v. Lileikis,* 929 F.Supp. 31, 38 (D.Mass.1996); *Kalejs v. INS,* 10 F.3d 441, 447 (7th Cir.1993)).

147. Furthermore, Defendant's name does not appear on a Soviet wanted list or all points bulletin, indicating that the Soviets were not actively searching for him. (Tr. 6–15 (afternoon), at 68; 6–17 (morning), at 47).

148. In 1995, three men told Canadian authorities that Soviet investigators coerced or falsified confessions from them in the 1940's. (DX 13, 15, 17)

149. In their statements, all three men contradict reliable historical evidence indicating that each participated in Nazi service. Their statements avoided implicating themselves in atrocities and other bad acts. (*Compare* DX 13 at 3–5, *with* GX 53, GX 95 at entry 58, GX 26 at entry 64, and Tr. 6–17 (morning), at 44–46; *compare* DX 15, *with* GX 95 entry 50, GX 26 at entry 63, and Tr. 6–17 (morning), at 32–35; and *compare* DX 17, *with* Tr. 6–17 (morning), at 40–43).

150. Those contradictions undermine the credibility of the men regarding their claims of coerced, false confessions; to support their present stories, the men had to disavow prior statements in which they acknowledged historically documented war-

time conduct. (Tr. 6–17 (morning), at 39–40, 43, 46–47).

151. The Court also notes that coerced confessions are not necessarily false confessions.

152. The claims of coerced interrogations does not impeach or undermine the Court's finding that Defendant is Guard 3308. (¶¶ 148–151).

153. Iwan Mandycz does not possess a Waffen–SS blood-type tattoo, or a scar indicating that he previously had such a tattoo. (GX 123 at 128, 134).

154. The German wartime practice of issuing blood-type tattoos to members of the Waffen–SS was haphazard. Thus, although the presence of such a tattoo on an individual is indicative of a Waffen–SS affiliation, the absence of such a tattoo does not entail that an individual did not serve the Nazis. (Tr. 6–15 (afternoon), at 65–66).

155. In 1948, Congress enacted the Displaced Persons Act ("DPA"), to assist European refugees rendered homeless by the war in emigrating to the United States. (Pub.L. No. 80–774, ch. 647, 62 Stat. 1009; DeCapua Dep. at 19–20).

156. Mario DeCapua, whose testimony was provided by deposition, is qualified to testify as an expert on the eligibility standards for immigration under the DPA, and the process used to screen and approve applicants under the DPA. (DeCapua Dep. at 18, Fed.R.Evid. 702). The Court considers his testimony to be credible.

157. The Displaced Persons Commission ("DPC") administered the DPA. Before applicants could apply to the DPC for eligibility determinations, the DPA required that applicants first seek and obtain certification from the International Refugee Organization ("IRO") that they were displaced persons and "of concern" to the IRO by virtue of their wartime and post-war experiences, as defined in Annex I of the IRO Constitution. (DPA, § 10, 62 Stat. 1013; *United States v. Kowalchuk*, 773 F.2d 488, 492–94 (3d Cir.1985) (en banc); DeCapua Dep. at 24–25).

158. An applicant who obtained IRO certification as an eligible displaced person could then apply to the DPC to determine his eligibility for an immigrant visa under the DPA. (*See Kowalchuk*, 773 F.2d at 492; DeCapua Dep. at 24–25).

159. As part of his attempt to obtain IRO certification, Defendant completed and signed an IRO questionnaire, or *"Fragebogen."* (GX 5; DeCapua Dep. at 26–28).

160. On his *Fragebogen*, Defendant claimed that he had remained in Olievo–Korolivka until 1943, when he was taken by the Germans to Austria as a forced laborer. Defendant further claimed that from 1943 to 1944, he worked as a forced laborer in Vienna, at the Seuring Company. (GX 5).

161. The statements in the *Fragebogen* are false and misleading, as they conceal and omit reference to Defendant's service as Guard 3308. (*Compare* GX 5 *with* ¶¶ 1–86).

162. Based on his statements, Defendant was certified as an eligible displaced person by the IRO. (GX 5; GX 7).

163. The DPA also vetted the applicants through a background investigation. (DeCapua Dep. at 26–28).

164. The United States Army's Counter Intelligence Corps ("CIC") conducted the background investigations and interviewed applicants on behalf of the DPC. (DeCapua Dep. at 27).

165. In conducting its investigation, CIC investigators would interview each applicant. (DeCapua Dep. at 27, 29).

166. The CIC checked the consistency of the applicant's background information with the information given to the IRO, and investigated whether the applicant had assisted in persecution during the war, or was a member of or participated in a movement hostile to the United States. (DeCapua Dep. at 27–28).

167. The CIC had no access to information possessed by entities in countries that fell under Soviet occupation. (DeCapua Dep. at 28–29, 61).

168. Because the information from the Soviet occupied countries was unavailable, the CIC's primary source of information in certain cases was the applicant himself. (DeCapua Dep. at 27, 29).

169. Following its investigation, the CIC submitted a written report to the DPC. (DeCapua Dep. at 29).

170. Based on the information available at that time, the CIC concluded that there was "no evidence" reflecting adversely on Defendant's background sufficient to affect his eligibility for immigration under the DPA, and that there was "no evidence" he had been a member of or participated in a hostile movement. (DeCapua Dep. at 29–31).

171. There is no evidence that the CIC inquired into, or was able to ascertain, whether a Seuring Company existed during World War II. (GX 5; DeCapua Dep. at 51; Tr. 6–17 (morning), at 69–70, 82, 85).

172. Defendant told the CIC the same information that he told the IRO; any discrepancies in his story would have been noted as "derogatory information." (GX 5; DeCapua Dep. at 32).

173. Standard procedure called for DPC Case Analysts to review the file of each applicant and determine whether an applicant was eligible and desirable for displaced person status and entry into the United States. The file included information provided by the applicant as well as information received from the IRO and CIC. (Stip. Fact (8) at docket entry 115; DeCapua Dep. at 32–33).

174. The DPC generally did not duplicate the CIC's work by interviewing the applicants again. Rather, DPC Case Analysts relied on the information contained in the IRO and CIC files. (GX 1 at 5; DeCapua Dep. at 52–53, 64).

175. At the conclusion of its screening process, the DPC issued a report on the applicant's eligibility. (GX 1 at 5).

176. Defendant's DPC report cannot be located. Regardless, the Court finds that Defendant did undergo the DPC screening process, since other forms in evidence are exclusive to the DPC, and since his visa application indicates that he was processed under "PL 774," which refers to the DPA. (GX 1 at 6; GX 5; DeCapua Dep. at 33).

177. Defendant omitted and concealed his Trawniki training and his service as a guard at the Trawniki and Poniatowa forced labor camps throughout the immigration process; such infor-

mation would have been noted in the CIC report as "derogatory." (GX 5; GX 7; DeCapua Dep. at 31).

178. The DPC never learned that Defendant had been a Trawniki-trained guard at Nazi forced labor camps or a member of the Guard Forces of the SS and Police Leader in Lublin District. (DeCapua Dep. at 34–35, 69).

179. Certification as eligible by the DPC was a prerequisite to consideration for a DPA visa in 1949. (GX 1 at 5; DeCapua Dep. at 53).

180. On December 1, 1949, Defendant completed, signed and submitted a sworn "Application for Immigration Visa," on which he again claimed to have been in Austria from May 1943 to the date of his application. (GX 7; Stip. Fact (9) at docket entry 115).

181. Based upon the information provided by Defendant to the United States, an immigrant visa was issued to Defendant under the DPA on December 2, 1949. (Stip. Fact (11) at docket entry 115).

182. Defendant entered the United States at the Port of New York on December 27, 1949. (Stip. Fact (12) at docket entry 115).

183. On or about May 13, 1955, Defendant filed an Application to File Petition for Naturalization with the United States Immigration and Naturalization Service and orally swore to the truth of the information he provided therein. (Stip. Fact (13) at docket entry 115; GX 7).

184. On June 30, 1955, the United States District Court for the Eastern District of Michigan granted Defendant's Petition for Naturalization and issued him Certificate of Natu-

ralization No. 7535606. (Stip. Fact (14) at docket entry 115; GX 7).

185. Defendant has resided in the Detroit Metropolitan area ever since his naturalization. (GX 123 at 19; GX 7).

186. At his deposition for this case, Defendant recounted that he was taken from his home to work on a farm in Linz during World War II. He stated that he lived in a complex with approximately 25 barracks, and was taken each day to work on a different farm. (Tr. 6–15 (morning), at 41–43).

187. That story is the same one Defendant told his adult daughter throughout her life, before the onset of Defendant's health problems, thus indicating Defendant's lucidity at his deposition. (GX 135).

188. Defendant's story is inconsistent with the historical record, because forced farm workers taken to perform labor in the Reich during World War II primarily worked on one farm at a time, where they lived with only a few other laborers. (Tr. 6–15 (morning), at 42–43).

189. Defendant has presented no historical documentation or other evidence to substantiate his claim that he was a forced laborer working on a farm in Linz during World War II. (Tr. 6–15 (morning), at 44).

190. The Court finds Defendant's account to lack credibility because of its inconsistency with the historical evidence and the corroborating statements discussed above. (*Compare* 186 *with* ¶¶ 1–154).

191. No credible evidence undermines the conclusion that Defendant served as Guard 3308.

192. The identification of Defendant and Guard 3308, as well as the relevant

conduct of Guard 3308, has been shown by clear, convincing, and unequivocal evidence. (¶¶ 1–154).

## III. CONCLUSIONS OF LAW

### A. *Jurisdiction and Venue*

193. This Court has jurisdiction over this matter under 28 U.S.C. § 1345, which provides district courts with original jurisdiction for civil actions brought by the United States.

194. Jurisdiction is also proper under 8 U.S.C. § 1451(a), which provides district courts with original jurisdiction for denaturalization actions.

195. Venue is proper in this district because it is the district in which Defendant resides. 8 U.S.C. § 1451(a); ¶ 185.

### B. *Legal Standard*

196. The Government must prove its case by evidence that is clear, convincing, and unequivocal. *Kungys v. United States,* 485 U.S. 759, 772, 108 S.Ct. 1537, 99 L.Ed.2d 839 (1988) (citation omitted); *Fedorenko v. United States,* 449 U.S. 490, 505, 101 S.Ct. 737, 66 L.Ed.2d 686 (1981) (citation omitted); *United States v. Dailide,* 227 F.3d 385, 389 (6th Cir.2000) (citing *Fedorenko* ).

### C. *Naturalization and the Displaced Persons Act*

197. If naturalization was "illegally procured," then the grant of citizenship "can be set aside." 8 U.S.C. § 1451(a); *Dailide,* 227 F.3d at 389 (citation omitted).

198. Naturalization is illegally procured if there has not been "strict compliance with all the congressionally imposed prerequisites to the acquisition of citizenship." *Fedorenko,* 449

U.S. at 506, 101 S.Ct. 737; *see* 8 U.S.C. § 1451(a); *United States v. Demjanjuk,* 367 F.3d 623, 629 (6th Cir.2004) (citing *Fedorenko* ); *Dailide,* 227 F.3d at 389 (citing *Fedorenko* ).

199. One legal prerequisite to the acquisition of citizenship is that the individual have entered this country under a valid visa. *See Fedorenko,* 449 U.S. at 514–15, 101 S.Ct. 737; *United States v. Dailide,* 316 F.3d 611, 618 (6th Cir.2003); *Demjanjuk,* 367 F.3d at 629, 636 (citing *Dailide* ).

200. In 1949, the criteria for a "displaced person" eligible for entry into the United States under the Displaced Persons Act ("DPA"), incorporated the eligibility criteria of the International Refugee Organization ("IRO"). 62 Stat. 3037–3055; *See Dailide,* 227 F.3d at 390; *United States v. Koreh,* 59 F.3d 431, 438 (3d Cir.1995).

### D. *Defendant Assisted the Enemy in Persecuting Civil Populations*

201. Annex I, Part II of the IRO Constitution excluded certain categories of persons from "the concern" of the IRO, including "[a]ny [ ] persons who can be shown: (a) to have assisted the enemy in persecuting civil populations of countries." (Annex I, Part II, Section 2(a), *reprinted in* 62 Stat. 3051 (1948); GX 6 at 151); *See Fedorenko,* 449 U.S. at 496 n. 4, 101 S.Ct. 737; *Dailide,* 227 F.3d at 390; *Koreh,* 59 F.3d at 438.

202. Persecution refers to "the infliction of sufferings, harm, or death upon those who differ ... in a way regarded as offensive" and "a campaign having for its object the subjugation or extirpation of the adherents of a religion." *United*

*States v. Sokolov,* 814 F.2d 864, 874 (2d Cir.1987) (quoting Webster's Dictionary); *Koreh,* 59 F.3d at 440 (quoting *Sokolov* for the definition of persecution).

203. Applicants bore the burden of proof in establishing their eligibility as displaced persons under the DPA. DPA § 10, 63 Stat. 1013.

204. A defendant need not have *personally* or *voluntarily* participated in particular acts of persecution in order to qualify as having assisted in persecution within the meaning of the law; "an individual's service in a unit dedicated to exploiting and exterminating civilians on the basis of race or religion constitutes assistance in persecution." *Demjanjuk,* 367 F.3d at 637 (citing *Fedorenko,* 449 U.S. at 512, 101 S.Ct. 737 and *Dailide,* 227 F.3d at 390–91); *United States v. Ciurinskas,* 148 F.3d 729, 734 (7th Cir.1998); *United States v. Breyer,* 41 F.3d 884, 890 (3d Cir.1994); *Szehinskyj,* 277 F.3d 331, 334 (3d Cir.2002). *See also Hammer v. INS,* 195 F.3d 836, 843–844 (6th Cir.1999).

205. In interpreting Section 2(b) of the DPA, the Supreme Court has held, "an individual's service as a concentration camp armed guard—whether voluntary or involuntary—made him ineligible for a visa." *Fedorenko,* 449 U.S. at 512, 101 S.Ct. 737; *Demjanjuk,* 367 F.3d at 637; *Dailide,* 227 F.3d at 390–391.

206. An individual can assist in persecution without being armed; therefore a defendant need not have been armed to establish that he assisted in persecution. *See Dailide,* 227 F.3d at 393 ("whether [Defendant, who conducted prison interviews,] was armed or unarmed, these de-

fenseless Jewish civilians were at his mercy").

207. Defendant, as Guard 3308, served as an armed guard of Jewish civilians at the Trawniki Labor Camp, which constituted assistance in persecution of civil populations under Section 2(b) of the DPA. *See United States v. Wasylyk,* 162 F.Supp.2d 86, 93–94 (N.D.N.Y.2001) (guard service at Budzyn forced labor camp); *United States v. Hajda,* 963 F.Supp. 1452, 1461 (N.D.Ill.1997) (guard service at Trawniki and elsewhere), *aff'd,* 135 F.3d 439 (7th Cir.1998); *United States v. Schiffer,* 831 F.Supp. 1166, 1198–99 (E.D.Pa.1993) (guard service at Trawniki and elsewhere), *aff'd,* 31 F.3d 1175 (3d Cir.1994); *see also Fedorenko,* 449 U.S. at 512, 101 S.Ct. 737 (concentration camp guard service renders applicant ineligible under DPA); *Breyer,* 41 F.3d at 890 (same).

208. Defendant, as Guard 3308, also served as an armed guard of Jewish civilians at the Poniatowa Labor Camp, which constituted assistance in persecution of civil populations within the meaning of Section 2(b) of the DPA and the IRO Constitution. *See Wasylyk,* 162 F.Supp.2d at 94; *Hajda,* 963 F.Supp. at 1461, *aff'd,* 135 F.3d 439 (7th Cir.1998); *Schiffer,* 831 F.Supp. at 1199, *aff'd,* 31 F.3d 1175 (3d Cir.1994); *see also Fedorenko,* 449 U.S. at 512, 101 S.Ct. 737; *Breyer,* 41 F.3d at 890.

209. Even if Defendant did not serve voluntarily or personally commit acts of persecution, his "service in a unit dedicated to exploiting and exterminating civilians on the basis of race or religion constitutes" assistance in persecution within the meaning of the DPA. *Demjanjuk,* 367 F.3d at

637; *see Ciurinskas,* 148 F.3d at 734 ("Even if [Defendant] had not personally participated, his service in [a group that performed mass executions of Jews] is sufficient to constitute assistance in persecution, as set out in § 2(b) of the DPA and the IRO Constitution .... We see little difference between being a concentration camp guard ... and being a member of a force dedicated to the extermination ... of civilians.").

210. Defendant's active membership in the Guard Forces from April until November 1943 constitutes assistance in persecution under Section 2(b) of the DPA. *See* ¶ 5–10; *Demjanjuk,* 367 F.3d at 637; *Ciurinskas,* 148 F.3d at 734; *United States v. Osidach,* 513 F.Supp. 51, 99 (E.D.Pa. 1981).

211. The Government has proved by clear, unequivocal, and convincing evidence that Defendant assisted in the persecution of civilian populations during World War II. (¶¶ 1–192).

212. Because of his assistance in persecution, Defendant was ineligible to immigrate to the United States. DPA § 2(b), 62 Stat. 1013 (1948).

213. Defendant's entry to the United States for permanent residence in 1949 was therefore unlawful and his naturalization as a United States citizen was illegally procured. *See Demjanjuk,* 367 F.3d at 637; *Dailide,* 227 F.3d at 395; *Stelmokas,* 100 F.3d at 319 n. 1.

E. *Defendant was a Member and Participated in a Movement Hostile to the United States*

214. Section 13 of the DPA also prohibited the issuance of a visa to any applicant who "is or has been a member of, or participated in, any movement which is or has been hostile to the United States or the form of government of the United States." 62 Stat. 1014; 64 Stat. 227. *See Koreh,* 59 F.3d at 443.

215. The plain language of this statute indicates that *either* membership *or* participation in a hostile movement is sufficient to prohibit the issuance of a visa. 62 Stat. 1014; 64 Stat. 227.

216. A list of organizations considered hostile movements under Section 13 was compiled in a document known as the "Inimical List." (GX 2–3).

217. The fact that an organization does not appear on the "Inimical List" is not dispositive of its status as a hostile movement. *See United States v. Kowalchuk,* 773 F.2d 488, 496 (3rd Cir.1985) (member of Ukrainian schutzmannschaft "would have been rejected even though the Ukrainian schutzmannschaft was not on a list of inimical organizations"); *Koreh,* 856 F.Supp. at 902 ("every case which has considered the movement hostile provision of the DPA has concluded that employment by an organization which aided the enemies of the United States, in a position that entailed compliance with or promotion of the policies of that organization, constituted participation and membership in a movement hostile—[inimical] list or no list"), *aff'd,* 59 F.3d 431 (3rd Cir.1995).

218. The Guard Forces constitute a movement hostile to the United States under Section 13 of the DPA, even though the Guard Forces do not appear on the Inimical List. *See U.S. v. Kwoczak,* 210 F.Supp.2d 638 (E.D.Pa.2002), *as amended,* No. 96–

5632, 2002 WL 32137688, at *3 (E.D.Pa. Nov. 1, 2002); *Hajda*, 963 F.Supp. at 1461 (member of Guard Forces who guarded at Trawniki and Treblinka labor camp was member of a movement hostile to the United States).

219. Service as an armed guard at a Nazi-operated camp constitutes participation in a movement hostile to the United States under Section 13 of the DPA. *United States v. Negele*, 222 F.3d 443, 447 (8th Cir.2000) (concentration camp guard) (citing *Breyer*, 41 F.3d at 890).

220. The degree of participation or involvement in the hostile movement is irrelevant. *Koreh*, 59 F.3d at 444–45 (citing *Osidach*, 513 F.Supp. at 72).

221. A defendant's participation in a hostile movement need not be voluntary. *See Ciurinskas*, 148 F.3d at 734; *but see Koreh*, 59 F.3d at 444 (indicating in dictum that although personal participation need not be proven, willing membership was still required).

222. Clear, unequivocal, and convincing evidence demonstrates that Defendant participated in a movement hostile to the United States under the DPA through his guard service at the Trawniki Labor Camp as Guard 3308. *See Negele*, 222 F.3d at 447; *Breyer*, 41 F.3d at 890–91; *Hajda*, 963 F.Supp. at 1461.

223. Clear, unequivocal, and convincing evidence demonstrates that Defendant participated in a movement hostile to the United States under the DPA through his guard service at the Poniatowa Labor Camp as Guard 3308. *See Negele*, 222 F.3d at 447; *Breyer*, 41 F.3d at 890–91; *Hajda*, 963 F.Supp. at 1461.

224. As a matter of law, and because the Government has established Defendant's participation in the movement, the Government need not show that Defendant's membership in the Guard Forces was willing. *Ciurinskas*, 148 F.3d at 729.

225. Nonetheless, Defendant's service may be considered willing or voluntary because he was paid, eligible for leave and benefits, and there is no evidence he sought to desert or flee. *Ciurinskas*, 148 F.3d at 729. Cf. *Koreh*, 59 F.3d at 444.

226. Clear, unequivocal, and convincing evidence demonstrates that Defendant was a member of a movement hostile to the United States under the DPA through his service and membership in the Guard Forces. *See Hajda*, 963 F.Supp. at 1461; *see also Koreh*, 59 F.3d at 431; *Sokolov*, 814 F.2d 864; *U.S.* v. *Koziy*, 728 F.2d 1314 (11th Cir.1984).

227. Because of his membership and participation in a movement hostile to the United States, Defendant was ineligible to immigrate to the United States under Section 13 of the DPA. 62 Stat. 1014; 64 Stat. 227.

228. Defendant's entry into the United States for permanent residence in 1949 was therefore unlawful and his naturalization as a United States citizen was illegally procured. *See Negele*, 222 F.3d at 447.

## IV. ORDER

**ACCORDINGLY, IT IS HEREBY ORDERED** that the United States citizenship of Defendant Iwan Mandycz is **REVOKED.**

**IT IS FURTHER ORDERED** that the order of the United States District Court

for the Eastern District of Michigan, Southern Division, dated June 30, 1959, admitting Defendant to United States citizenship is **VACATED.**

**IT IS FURTHER ORDERED** that Defendant's Certificate of Naturalization, number 7535606, is **CANCELLED.**

**IT IS FURTHER ORDERED** that Defendant is **ENJOINED** from claiming any rights, privileges, benefits, or advantages of United States citizenship.

**IT IS FURTHER ORDERED** that Defendant shall **SURRENDER AND DELIVER** within fourteen (14) days of service of this order his Certificate of Naturalization number 7535606, his expired or unexpired United States passports, if any, and any other formal indicia of United States citizenship.

**SO ORDERED.**